Charles J. SLAKAN, Appellee,

v.

T.C. PORTER, M.M. Walters, Amos
Reed, Ralph Edwards, Sam
Garrison, Appellants.

and

J.B. Barefoot, J.G. Watson, D.R. Woo-
dard, Jack Lemons, Defendants.

No. 83–6542.

United States Court of Appeals,
Fourth Circuit.

Argued Feb. 10, 1984.

Decided June 5, 1984.

Rehearing and Rehearing En Banc
Denied Aug. 13, 1984.

370

Lucien Capone, III, Asst. Atty. Gen., Raleigh, N.C. (Rufus L. Edmisten, Atty. Gen., Raleigh, N.C., on brief), for appellants.

Charles T.L. Anderson, Apex, N.C. (Richard E. Giroux, North Carolina Prisoner Legal Services, Inc., Raleigh, N.C., on brief), for appellee.

Before SPROUSE and CHAPMAN, Circuit Judges, and PECK, Senior Circuit Judge.*

SPROUSE, Circuit Judge:

Charles J. Slakan, a North Carolina inmate, was injured when prison guards Michael Walters, Tracy Porter, and Johnny Barefoot used high-pressure water hoses, tear gas, and billy clubs to subdue him while he was confined in a one-man cell. He brought a 42 U.S.C. § 1983 suit against the three guards and three high ranking prison supervisory officials, Warden Sam Garrison, Director of Prisons Ralph Edwards, and Secretary of Corrections Amos Reed, alleging (1) that the guards used excessive force against him in violation of the eighth amendment's cruel and unusual punishment clause and (2) that supervisory officials were deliberately indifferent to a known risk of harm, as evidenced by their failure to provide prison guards with adequate training and guidance. The jury absolved prison guard Porter of liability, but awarded Slakan $32,500 in combined compensatory and punitive damages against the remaining five defendants. We affirm.

* Hon. John W. Peck, Senior Circuit Judge, Sixth Circuit, sitting by designation.

## I

Slakan was housed in a one-man cell at Central Prison in Raleigh, North Carolina, during the episode involved in this appeal. Walters, Porter, and Barefoot were prison guards assigned to the intensive management section of the Raleigh facility where Slakan was confined. Garrison was the Central Prison Warden and Edwards and Reed served as North Carolina's Director of Prisons and Secretary of Corrections, respectively.

On the morning of August 3, 1979, Slakan awakened to discover that he and many of his fellow inmates had missed receiving their usual morning cup of coffee. He complained loudly and finally drew the attention of Walters, the acting lieutenant in charge of cell-blocks A, B, C and D. Walters brusquely rejected Slakan's complaint and began walking away from the cell when the inmate reached through the bars of his door and slapped the lieutenant on the shoulder. The parties vigorously dispute the amount of force Slakan used to impede the guard's movement. Walters spun around upon receiving the blow and flung a cup of coffee he was holding in Slakan's direction, striking the prisoner in the face and shoulder. Enraged, Slakan spewed obscenities at Walters, who immediately called for a water hose to quell the one-man disturbance. The hose was brought to the cell door and a blast of water was directed at Slakan's head and neck. The inmate panicked and hurled toilet paper, cleaning agents, and other small items within his reach towards Walters. Another hose was ordered and a second blast of water was directed at Slakan's head and neck, forcing him against the back wall of his cell.

Meanwhile, tear gas was sprayed into the cell every several minutes, eventually rendering the prisoner powerless. Guards Walters, Barefoot, and Porter ceased their two-pronged attack against Slakan after five to ten minutes and entered his cell. One of the guards struck Slakan twice on the head with a billy club causing him to fall onto his bed. He then was beaten repeatedly on the head and body an indeterminate number of times until he apparently lost consciousness. Slakan eventually was removed from the cell and taken to the first aid room for treatment. He required sixty-nine stitches for the head wounds received during the attack, and reportedly suffered minor contusions and eye irritation from the water blasts and tear gas.

Slakan, acting *pro se*, filed suit against the guards involved in the episode, alleging that they had used excessive force in the conduct of their duties. He also named Warden Garrison, Director Edwards, and Secretary Reed as co-defendants, claiming that they either had been deliberately indifferent to the use of excessive force by guards or had tacitly authorized such practices through their regulations and policies. The district court appointed counsel to assist Slakan in the presentation of his case, and all parties consented to jury trial before a United States magistrate.

The trial began on May 31, 1983, and lasted four days. The evidence relating to the guard's excessive use of force in subduing Slakan was straightforward and convincing. The evidence relating to the supervisory liability of Garrison, Edwards, and Reed, however, was much more indirect and involved. It showed that, though none of the three men had given express approval for the use of force against Slakan, they were all aware of seven recent cases involving the use of high-pressure hoses against Central Prison inmates housed in one-man cells. The evidence further showed that Garrison and Edwards had disapproved of a gubernatorial committee's call for rules restricting the use of high pressure water hoses to situations in which the inmate posed a threat to himself or others. Slakan's case against Secretary Reed focused principally on his failure to enact regulations specifying when and under what circumstances high-pressure hoses, billy clubs, and tear gas might be used against a prisoner in a one-man cell.

The jury deliberated for a few hours and returned a verdict for the plaintiff against

all defendants except Porter, one of the guards allegedly responsible for striking Slakan on the head. All five remaining defendants were ordered to pay $500 each in compensatory damages and sums ranging from $10,000 to $1,000 each in punitive damages, for a total award to Slakan of $32,500. On appeal, the various defendants seek reversal on the following grounds: (1) the evidence adduced at trial was insufficient to establish the supervisory liability of Garrison, Edwards or Reed; (2) in any event, these officials enjoyed qualified immunity because they did not violate any of Slakan's established constitutional rights; (3) the video demonstration of the effects of a high-pressure water hose was prejudicial and should have been excluded; (4) the trial court erred by ruling that the plaintiff's conversations with his psychologist immediately after the attack were privileged; and (5) the trial court erred by permitting an expert to testify about the punitive nature of North Carolina's practices concerning the use of water hoses against inmates.

## II

■ The unjustified striking or beating of a prisoner by police or correctional officials constitutes cruel and unusual punishment which is actionable under 42 U.S.C. § 1983. *Wellington v. Daniels,* 717 F.2d 932, 935 (4th Cir.1983); *King v. Blankenship,* 636 F.2d 70, 72 (4th Cir.1980). *See also Bruce v. Wade,* 537 F.2d 850 (5th Cir.1976); *Johnson v. Glick,* 481 F.2d 1028 (2d Cir.), *cert. denied,* 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 (1973). Society's intolerance for such brutality is well-documented, but it rises to new levels when the instrument of harm, even when properly used, possesses inherently dangerous characteristics capable of causing serious and perhaps irreparable injury to the victim. High-pressure water hoses, tear gas, and billy clubs, though legitimate forms of control in certain circumstances, become instruments of brutality when used indiscriminately against a defenseless prisoner. *See, e.g., Spain v. Procunier,* 600 F.2d 189 (9th Cir.1979). Even when a prisoner's conduct warrants some form of response, evolving norms of decency require prison officials to use techniques and procedures that are both humane and restrained.

■ The prison guards' heavy-handed use of water hoses, billy clubs, and tear gas against Slakan unquestionably crossed the line separating necessary force from brutality. The prisoner was locked in a one-man cell at the time of the incident and posed no direct physical threat to other inmates or any of the guards. His abusive language may have deserved punishment through the prison disciplinary machinery, but it assuredly did not justify subjecting him to steady blasts of water from two high-pressure hoses or beating him savagely around the head and body with billy clubs. The guards' conduct indisputably deprived Slakan of a right secured by the Constitution and the laws of the United States. *Baker v. McCollan,* 443 U.S. 137, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979). Our principal focus, then, is determining whether the responsibility for that deprivation can be traced to the actions of the guards' supervisors.

### A

■ The decisions of this Court have firmly established the principle that supervisory officials may be held liable in certain circumstances for the constitutional injuries inflicted by their subordinates. *See Orpiano v. Johnson,* 632 F.2d 1096, 1101 (4th Cir.1980), *cert. denied,* 450 U.S. 929, 101 S.Ct. 1387, 67 L.Ed.2d 361 (1981). *See also Wellington,* 717 F.2d at 936; *Withers v. Levine,* 615 F.2d 158 (4th Cir.1980). Liability in this context is not premised on *respondeat superior, Monell v. Department of Social Services,* 436 U.S. 658, 691, 98 S.Ct. 2018, 2036, 56 L.Ed.2d 611 (1978), but on a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care. *Orpiano,* 632 F.2d at 1101.

The plaintiff, of course, assumes a heavy burden of proof in supervisory liability cases. He not only must demonstrate that the prisoners face a pervasive and unreasonable risk of harm from some specified source, but he must show that the supervisor's corrective inaction amounts to deliberate indifference or "tacit authorization of the offensive [practices]". *Orpiano,* 632 F.2d at 1101 (quoting *Withers v. Levine,* 615 F.2d 158, 161)(4th Cir.1981). Ordinarily, he cannot satisfy his burden of proof by pointing to a single incident or isolated incidents, *Orpiano,* 632 F.2d at 1101, for a supervisor cannot be expected to promulgate rules and procedures covering every conceivable occurrence within the area of his responsibilities. Nor can he reasonably be expected to guard against the deliberate criminal acts of his properly trained employees when he has no basis upon which to anticipate the misconduct. A supervisor's continued inaction in the face of documented widespread abuses, however, provides an independent basis for finding he either was deliberately indifferent or acquiesced in the constitutionally offensive conduct of his subordinates. *Id. See also Wellington,* 717 F.2d at 936.

Supervisory liability in the civil rights context may extend to the highest levels of state government. *See, e.g., Scheuer v. Rhodes,* 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). The outer limits of liability in any given case are determined ultimately by pinpointing the persons in the decisionmaking chain whose deliberate indifference permitted the constitutional abuses to continue unchecked. The final determination "generally is one of fact, not law," *Avery v. County of Burke,* 660 F.2d 111, 114 (4th Cir.1981), but state statutes fixing the administrator's legal duties provide a useful guide in determining who had the responsibility and capability to end the offensive practices.

We are satisfied that the evidence offered by Slakan against Warden Garrison, Director Edwards, and Secretary Reed established the supervisory liability of these government officials. *Cf. McElveen v. Hutto,* 725 F.2d 954 at 958 (4th Cir.1984) (fact-finding by jury will be set aside only where evidence, viewed in light most favorable to prevailing party, is so clearly wrong that reasonable persons could not reach any other conclusion than that asserted by losing party on appeal). Garrison was responsible for the day-to-day operations of the Central Prison and for the training and conduct of the guards. He admitted at trial that he knew of and condoned the use of high-pressure water hoses against inmates housed in one-man cells on at least seven occasions in the twelve months preceding the attack upon Slakan.[1] He admit-

---

1. In the months immediately preceding the Slakan incident, several inmates confined in one-man cells were sprayed with tear gas and hosed by Central Prison guards. Only one of the incidents involved an inmate posing a physical threat to himself or guards.

Inmate Ingram complained about a prison guard's failure to provide him with a pork-free meal and slung his food tray at his cell door. Although he was secure in his cell and posed no threat to himself, guards or other inmates, he was subjected to the water blast from a high-pressure hose for several minutes. The Warden took no action against the guards involved.

Inmate Grogan reportedly was acting strange late one night while the other prisoners were sleeping. He apparently threw his radio from his cell and used abusive language when a guard investigated. He was hosed for five minutes. The Warden approved of the use of force in the incident.

Inmate Shephouser was sprayed with tear gas and hosed for five minutes after he threw a light bulb and mirror from his cell. The mirror struck a guard in the chest, but did not cause any injury. The prisoner was not armed and posed no direct physical threat to himself, guards or other inmates. The Warden approved of the use of force.

Inmate Rice was confined in a one-man cell at Central Prison. On May 10, 1979, he twice threw unknown substances at passing inmates. He was warned by guards to cease and then sprayed with tear gas and a high-pressure water hose. He was treated for injuries at the first aid station. The guards were exonerated of any wrongdoing by the Warden.

Inmate Brower broke his food tray into pieces and began throwing them from his cell. He was sprayed with tear gas and later treated for eye irritation. The use of force was approved by the Warden.

Inmate Perry reportedly threw his food tray and cup of water at inmates serving his meal. He was sprayed with tear gas by prison guards

ted, moreover, that on one occasion he had personally approved of the use of a high-pressure hose against an inmate who was handcuffed and confined in a cell by himself.

Slakan's case against Garrison was bolstered by the testimony of a non-defendant guard who reportedly took part in six hosings while at Central Prison. He indicated that the practice was widespread among the guards and seldom questioned by supervisors. He also noted that alternative intervention techniques training was given to guards dealing with mental patients, but not to those handling regular inmates. Evidence introduced at trial further showed that Garrison had opposed a gubernatorial commission recommendation in 1975 that would have strictly regulated the use of water hoses against inmates locked in one-man cells. The commission recommendation was an outgrowth of an incident in which a North Carolina inmate was subjected to the high-pressure blast of a water hose for 25 to 30 minutes while he was securely confined in his cell. In sum, the prevalence of the hosing practice was well-known to Garrison, yet he failed to offer adequate guidance to his subordinates concerning the appropriate uses of such techniques when dealing with inmates securely confined.[2]

Director Edwards was responsible for the day-to-day operations of all prisons in the North Carolina system. One of his primary responsibilities was implementing policies governing the treatment of inmates. 5 N.C.ADMIN.CODE 2A. 0101. In his official capacity, Edwards became aware well before the Slakan incident that hoses and tear gas were routinely being used against inmates locked in their individual cells. He admitted specific knowledge about the seven incidents that immediately preceded the Slakan attack and indicated that he approved of the use of force in each case. He conceded that the practice created certain risks for the inmates, yet testified that he never attempted to discover the magnitude of the risks as part of a plan to restrict or regulate the practice. He conceded, moreover, that he had opposed implementing the 1975 commission recommendation concerning the need for tighter controls on the use of high-pressure hoses against cell-confined inmates. His own testimony also established that he had never issued orders placing restrictions on the use of hoses against inmates, despite his actual knowledge about the widespread reliance on the practice.

The case against Secretary Reed was equally convincing. The State of North Carolina invests the Secretary of Corrections with the responsibility for the "control and custody of all prisoners serving sentence(s) in the ... the prison system." N.C.Gen.Stat. § 148–4. Every state correctional facility is by statute placed under his "administrative control and direction." N.C.Gen.Stat. § 148–36. In discharging his duties, the Secretary is empowered to "propose rules and regulations for the government of the State prison system, which shall become effective when approved by the Department of Correction."

to bring him under control. The use of force was approved by the Warden.

Inmate Ingram was involved in a second hosing incident weeks before the Slakan attack. He reportedly reached through the bars of his cell and attempted to cut a passing guard with a razor blade. He refused to surrender the blade and then was sprayed with mace and subjected to water blast of a high-pressure hose for several minutes.

Inmate Mitchell became abusive with guards while he was in the visitation center, and was taken back in handcuffs to his one-man cell in the intensive management section of the prison. Several minutes later, the guards reappeared at his cell door with a water hose and began spraying the still handcuffed prisoner. The hosing lasted for nearly twenty-five or thirty minutes before the uproar of inmates witnessing the incident caused the guards to cease. Mitchell was treated by emergency room officials for his injuries. The Warden approved of the use of force against Mitchell.

2. Slakan introduced evidence indicating that the inmate population deeply resented the use of water hoses against individuals who were locked in their cells. In some instances, the use of water hoses actually triggered riotous behavior among those inmates forced to watch one of their own pinned against the wall of his cell by a continuous blast of water.

N.C.Gen.Stat. § 148–11. The Secretary shoulders specific responsibility for classifying prison facilities and for developing programs "so as to permit the proper segregation and treatment of prisoners according to the nature of the offenses committed, the character and mental conditions of the prisoners, and such other factors as should be considered in providing an individualized system of discipline, care and correctional treatment." N.C.Gen.Stat. § 148–36.

Slakan's case against Secretary Reed focused on his failure to exercise his statutory powers in a manner calculated to end the indiscriminate use of high-pressure water hoses against inmates securely housed in one-man cells. In support of his case, Slakan introduced copies of the Department of Correction's regulations governing the use of force against prisoners. Those regulations state 'that "[p]hysical force, firearms, tear gas, mace and other weapons for crowd and individual control will be used only when necessary to prevent escape or injury to staff, citizenry, or inmates; or to prevent damage to property." 5 N.C.ADMIN.CODE 2f. 1501(a). They do not differentiate, however, between the application of force against a roaming inmate and one locked in his one-man cell. Nor do they even mention the use of high-pressure water hoses against any segment of the prison population, much less provide proper guidance for their use against an individual securely segregated from the general prison population.

A correctional expert testifying on behalf of Slakan's claim detailed the shortcomings of the North Carolina regulations. He noted that the Secretary had failed to properly identify the circumstances justifying the use of tear gas against a prisoner and omitted any reference at all to the use of water hoses, thereby leaving the critical decisions as to the use of these inherently dangerous instrumentalities solely to the discretion of frontline personnel. He expressed the view that the use of water hoses and tear gas against cell-confined inmates was an act of punishment rather than an acceptable control measure. He also offered the opinion that the application of force against Slakan was an outgrowth of the prison system's failure to provide adequate direction to subordinates concerning the proper use of force against any inmate locked in a one-man cell.

Secretary Reed indisputably knew that water hosing was used as a routine control measure in North Carolina prisons. The evidence showed that Reed became Secretary shortly after a highly-publicized incident in which an inmate was hosed for 25 to 30 minutes while helplessly locked in his cell. Although he had no direct hand in the incident, Reed certainly must have been aware of the commission report recommending tighter controls on the use of water hoses in North Carolina prisons. Moreover, the prevalence of the practice was itself a circumstantial indication that administrators at all levels knew and approved of water hosings. The defendants admitted that seven cell-confined inmates were water hosed at Central Prison in the months immediately preceding the Slakan attack. Warden Garrison and Director Edwards testified that they had personal knowledge of these incidents and approved of the procedures followed in each case. A non-defendant guard testified that he was involved in at least six incidents of hosings in the years he spent at Central Prison without ever receiving a reprimand. There also was evidence of an incident in which an inmate was handcuffed and hosed for 25 to 30 minutes without any action being taken against the guards. Put bluntly, it is inconceivable that an administrator with direct statutory responsibility for prescribing the operating rules of the prison system would be unaware of a practice as rampant and as widely approved of as the use of water hoses against securely confined inmates. Any doubt about the Secretary's awareness was dispelled by the testimony of Warden Garrison, who indicated that Reed knew of the water hosing practices.

B

■ The failure of Garrison, Edwards, and Reed to act in the face of a known risk

of harm does not alone establish their liability to Slakan. Though their conduct may be fairly characterized as a breach of their legal and constitutional duties, they are not liable unless an affirmative causal link exists between their inaction and the harm suffered by Slakan. *Rizzo v. Goode,* 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976). *See also Wellington,* 717 F.2d at 936; *Bowen v. Watkins,* 669 F.2d 979, 988 (5th Cir.1982); *Sims v. Adams,* 537 F.2d 829, 831 (5th Cir.1976). The proof of causation may be direct, "as in *Monell,* where the policy commands the injury of which the plaintiff complains .... [o]r may be supplied by [the] tort principle that holds a person liable for the natural consequences of his actions." *Wellington,* 717 F.2d at 936.

■ The evidence presented at trial was sufficient to establish that Slakan's injuries were a natural and foreseeable consequence of the supervisors' indifference. Warden Garrison, Director Edwards, and Secretary Reed all had varying degrees of knowledge about the excessive and unregulated use of water hoses against unarmed, securely confined inmates in North Carolina's Central Prison. As experienced administrators, they were keenly aware of their special statutory and constitutional responsibilities to protect inmates against inhumane treatment. They all knew, moreover, that water blasts from a high-pressure hose would probably inflict injuries of unpredictable severity on inmates. Finally, they were cognizant of the volatile nature of the prison environment and the need to provide clear guidance to frontline personnel on the permissible uses of force against defenseless inmates.

The evidence conclusively establishes that, despite the obviousness of the danger and the ease with which it could have been abated, the supervisors failed to act. They provided little or no direction to their subordinates concerning the appropriateness of the water hosing practice or the safeguards that should be followed to protect the inmate from excessive force and injury. Critical decisions relating to permissible water pressure levels, exposure periods, and the circumstances justifying its use against securely confined inmates were all left to the guards' unbridled discretion. This administrative policy, or more accurately lack of policy, invited abuses of the kind experienced by Slakan.

### III

■ Garrison, Edwards, and Reed argue that, even if their conduct was actionable under § 1983, they are entitled to qualified immunity from money damages. We disagree. In *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2739, 73 L.Ed.2d 396 (1982), the Supreme Court carefully defined the contours of the qualified immunity or good faith defense: "[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *See also Butz v. Economou,* 438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978); *Procunier v. Navarette,* 434 U.S. 555, 98 S.Ct. 855, 55 L.Ed.2d 24 (1978); *Wood v. Strickland,* 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975); *Scheuer v. Rhodes,* 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). *Harlow* reaffirmed the principle that a public official cannot escape § 1983 liability by relying solely on his subjective good faith or lack of actual knowledge about the extent of his constitutional or statutory duties. His subjective state of mind is but one part of the formula, for he is presumed to know what the law requires and may be forced to pay money damages when his actions cross those well-marked boundaries. *Harlow,* 457 U.S. at 815, 102 S.Ct. at 2737. *See also McElveen et al. v. Hutto,* 725 F.2d 954 (4th Cir.1984).

The officials involved in the present case had explicit legal guideposts to follow in discharging their duties. At the time of Slakan's beating, the eighth amendment unquestionably protected inmates from the unjustified and excessive use of force by

prison officials. *See Bruce v. Wade,* 537 F.2d 850 (5th Cir.1976); *Pritchard v. Perry,* 508 F.2d 423, 425–26 (4th Cir.1975); *Johnson v. Glick,* 481 F.2d 1028 (2d Cir.) *cert. denied,* 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 (1973). Roughly the same protection was provided by North Carolina law. *See* N.C.Gen.Stat. § 148–20. Of course, the use of billy clubs, tear gas, and high-pressure hoses against securely confined prisoners was not then, and is not now, unlawful per se, *see Spain v. Procunier,* 600 F.2d at 195; *Clemmons v. Greggs,* 509 F.2d 1338 (5th Cir.), *cert. denied,* 423 U.S. 946, 96 S.Ct. 360, 46 L.Ed.2d 280 (1975), but North Carolina officials were or should have been aware of their firmly established duty to ensure that these legitimate instruments of control were not misused. *See Landman v. Peyton,* 370 F.2d 135 (4th Cir.), *cert. denied,* 385 U.S. 881, 87 S.Ct. 168, 17 L.Ed.2d 108 (1966).

Nor can these officials seriously argue that the application of eighth amendment liability to their actions represents a novel or unanticipated development in the jurisprudence governing § 1983 actions. In *Scheuer v. Rhodes,* 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90, which was decided five years before the incident involved here, the Supreme Court stated that officials at the highest levels of state government could be individually liable for the constitutional injuries they inflict. Moreover, well before the Slakan incident, this Court and others had acknowledged that the misconduct of frontline personnel could give rise to § 1983 actions against their supervisors in certain circumstances. *See Davis v. Zahradnick,* 600 F.2d 458, 459, n. 1 (4th Cir. 1979); *Bursey v. Weatherford,* 528 F.2d 483, 488 n. 7 (4th Cir.1975) *rev'd other grounds,* 429 U.S. 545, 97 S.Ct. 837, 51 L.Ed.2d 30 (1977); *Woodhous v. Virginia,* 487 F.2d 889 (4th Cir.1973). *See also Wright v. McMann,* 460 F.2d 126 (2d Cir.), *cert. denied,* 409 U.S. 885, 93 S.Ct. 115, 34 L.Ed.2d 141 (1972). Whether or not these officials were actually aware of their constitutional and statutory obligations, they are presumed to know what the law requires, and may be legally accountable for conduct that violates fixed standards.

IV

The prison guards and supervisory officials raise several evidentiary arguments that deserve brief mention. The first of their contentions is that the trial court erred in relying on North Carolina law for its ruling that conversations between Slakan and his psychologist were privileged and could not be disclosed. We agree, but find the error harmless. Federal Rule of Evidence 501 requires federal courts to determine testimonial privileges in accordance with federal common law, except in cases in which the law of the state supplies the rule of decision. Slakan's federal constitutional claims obviously did not qualify for that exception and, therefore, the district court should have admitted the conversations pursuant to the well-settled federal rule that such communications are not privileged. *See United States v. Meagher,* 531 F.2d 752, 753 (5th Cir.), *cert. denied,* 429 U.S. 853, 97 S.Ct. 146, 50 L.Ed.2d 128 (1976).

Prison officials proffered the evidence to disclose the content of Slakan's communications with his psychologist in order to prove that he accepted partial responsibility for provoking the guard's attack. The same evidence or defense theory, however, was introduced through the testimony of at least two other witnesses. Nathan Rice, an assistant warden at Central Prison, testified that the plaintiff admitted his partial responsibility for the attack during the Warden's investigation of the incident. Slakan himself admitted that he had verbally confronted the prison guard and initiated physical contact by reaching through his cell doors. He also testified that he felt some responsibility for the incident. In short, the defendants' excluded evidence was merely cumulative of other witnesses' testimony and did not prejudice their attempt to present a provocation defense to the jury.

We find no merit in the defendants' contentions that the trial court erred by allowing a video tape to be viewed by the jury. The tape contained a visual depiction of the force unleashed by a hose squirting water under fifty five pounds of pressure. It was offered by Slakan to prove that serious injury could result from the indiscriminate and unregulated use of water hoses against inmates—a key element of his eighth amendment case against the prison officials. Its relevancy, therefore, was established. The only ground for excluding the evidence was its accuracy.

The water pressure and hose nozzle used against Slakan were the same as those depicted in the videotape documentation. Moreover, the tape was shown in conjunction with the expert testimony of a fireman who was fully qualified to discuss the force generated by high-pressure water hoses. There is no question, then, that the videotape accurately and fairly depicted the force applied against Slakan. In these circumstances, the trial court acted well within the bounds of its discretion in permitting the tape to be viewed by the jury. *See, e.g., Renfro Hosiery Mills Co. v. National Cash Register Co.*, 552 F.2d 1061 (4th Cir. 1977); *Jackson v. Fletcher*, 647 F.2d 1020 (10th Cir.1981).

We also find no merit in the prison officials' challenge to the admissibility of a correction expert's opinions concerning the punitive nature of North Carolina's water hosing practices. Federal Rules of Evidence 702 and 704 permit the trial court wide discretion in admitting expert testimony bearing on the ultimate issues in the case. The trial court here exercised that discretion only after assuring itself of the witness's professional expertise and his familiarity with the North Carolina procedures under scrutiny. The court took the additional cautionary step of instructing the jury as to the proper weight to be given to the expert's opinions. Its actions were entirely proper. *See, e.g., United States v. Logan*, 641 F.2d 860, 863 (10th Cir.1981) (expert accountant may testify as to wheth-er funds were improperly removed from agency).

Accordingly, the district court's judgment is affirmed.

AFFIRMED.