**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 06-2251**

CHRISTINE M. SANDERS,

Plaintiff - Appellant,

versus

ROBERT BROWN; ROBERT HOLDERBAUM, individually
and in his official capacity as Former
Principal of Newington Forest Elementary
School; FAIRFAX COUNTY SCHOOL BOARD; DONNA L.
LEWIS,

Defendants - Appellees.

Appeal from the United States District Court for the Eastern
District of Virginia, at Alexandria. Leonie M. Brinkema, District
Judge. (1:06-cv-00080-LMB)

Submitted: October 29, 2007        Decided: December 11, 2007

Before KING, GREGORY, and DUNCAN, Circuit Judges.

Affirmed by unpublished per curiam opinion.

Frederic W. Schwartz, Jr., Washington, D.C., for Appellant. Thomas
J. Cawley, Sona Rewari, HUNTON & WILLIAMS LLP, McLean, Virginia; A.
Richard Thorsey, THORSEY LAW FIRM PLLC, Fairfax, Virginia, for
Appellees.

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Christine M. Sanders appeals the district court's adverse grant of summary judgment in favor of, and the denial of relief on her 42 U.S.C. § 1983 (2000) complaint against, Donna Lewis.[1] Sanders, who is a 1998 graduate of Newington Forest, alleged that while she was enrolled in grades four through six at Newington Forest, Brown subjected her to inappropriate "physical and sexual touchings."[2]

The parties agree that the central inquiry in this case is what Brown did on the two prior occasions in which similar complaints against him were made during February and March 1996, and whether the actions Lewis took in response were so insufficient as to constitute deliberate indifference under § 1983. The facts presented to the district court, via deposition transcripts and supporting documentation, are as follows: Lewis was employed from 1989 until her retirement in 2003 by the School Board as an

---

[1]Sanders originally filed this civil action pursuant to 42 U.S.C. § 1983 (2000) and Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 et seq., against the Fairfax County School Board, Robert Holderbaum, a former principal of the Newington Forest Elementary School ("Newington Forest"), and Robert Brown, her former gym teacher while she was a student at Newington Forest. Sanders amended her complaint to add as a party defendant Donna Lewis, another former principal of Newington Forest, alleging a claim under § 1983 against Lewis in her individual capacity. This appeal is taken by Sanders challenging only the grant of summary judgment in favor of Lewis.

[2]She alleged sexual assault, sexual battery, and intentional infliction of emotional distress under Virginia common law against Brown.

elementary school principal.  In July 1995 Lewis became the principal of Newington Forest.  At the time, Brown was one of two physical education teachers at Newington Forest and had been teaching there for ten years.[3]

On February 22, 1996, the mother of a third-grader ("Student No. 7") met with Lewis and the assistant principal after school, and reported that her daughter told her that she had sat on Brown's lap, that he picked her up and turned her around to face him with her legs straddling him, and that it made her feel "uncomfortable."  The mother initially told Lewis that Brown had restrained her daughter and she was unable to leave, but then later corrected herself, telling Lewis that, while her daughter had not explicitly told her so, she assumed that Brown had restrained her daughter.  The mother was concerned and wanted to talk to Brown about the incident.  The mother reportedly also told Lewis that she "loved" Brown and that she knew he was a good teacher.  Based on the report, Lewis thought Brown may have exercised poor judgment, but she did not think that he had been sexually inappropriate with the student.

Prior to the start of school the following morning, Lewis met with Brown.  She told him that the mother of Student No. 7 had come to her expressing concerns and questioned him about any

---

[3]Brown was employed by Newington Forest as a physical education teacher from September 1987 until December 1999.

contact he had had with the student. Brown told Lewis that the student came and sat on his leg and asked for candy because she had been a helper at the end of gym class. He had no candy to give her. He remembered picking her up, turning her around to face him, and telling her that he would try to find some candy to give to her later. Brown was quite concerned and upset at having upset Student No. 7, and was anxious to speak with the student's mother. Lewis told him that he had exercised poor judgment and that they needed to meet with the student's mother.

As part of her investigation into the complaint by Student No. 7, Lewis called Holderbaum, who had preceded her as principal at Newington Forest, advised him that a parent had reported a concern to her, and asked whether there had been any previous concerns about Brown. Holderbaum told Lewis that there had been no complaints, and that Brown was one of the most respected and loved teachers at the school.

On February 23, 1996, Lewis, the mother of Student No. 7, and Brown met. Brown related the same explanation for his behavior that he had related to Lewis. The mother told Brown that she wanted to believe him, that she respected him, and that all three of her children loved him. Brown told Student No. 7's mother that if he had done anything to cause her daughter discomfort that he was very sorry and that he had not intended to do so.

After Brown left the room, Lewis advised the mother that if she was uncomfortable, she had every right to report the incident and that regardless of what she chose to do, Lewis would follow-up with Brown. The mother told Lewis that she wanted to believe that Brown had not done anything intentionally to make her daughter uncomfortable. Lewis did not disbelieve Brown's account, and she did not believe that there was anything sexual about what Brown had done, though she felt that he may not have exercised the best judgment in the situation. The mother was indecisive about how she was feeling at the conclusion of the meeting, wanted to discuss it with her husband, and she and Lewis decided they would talk the following Monday.

Lewis explained in deposition that she was "very clear" about the circumstances under which she had an obligation to report something to Child Protective Services ("CPS"), and that she had called CPS many times in the past. She attested that she did not feel that it was necessary to report this incident to CPS.

The morning following the Friday meeting with Brown, Lewis telephoned Student No. 7's mother, who told Lewis "very confidently" that she was "fine" with where she was now, that she and her husband had talked about it, and that she was "very comfortable that Mr. Brown meant no harm to [her] child." The mother stated that she did not wish to pursue the matter further, although she did request a letter of assurance from Brown that he

would not hold the report against any of her children.  She also told Lewis that she did not want anything in Brown's personnel file, that she did not want him to lose his job, and that she felt that what he had done merely was poor judgment on his part.

Lewis called Brown and told him what Student No. 7's mother had said.  She told him that he had used poor judgment, that it could have been interpreted in many ways, and that he and the school were fortunate that this parent was open and was willing to listen and be objective.  She also told him that they needed to talk about a plan of action or guidelines to make sure that he did not get himself in such a situation again.

Lewis drafted a memorandum to Brown, recounting the report and her investigation, and which contained several points to remind Brown about exercising good judgment.[4]  Lewis met with Brown, gave him a copy of the memo, and placed a copy in his personnel file.  She felt that the incident had been thoroughly discussed and was "very comfortable" that Brown had not intended anything "malicious" or to "harm the child."  She attested that she thought that Brown had made a "misjudgment," and did not think

[4]These included that Brown would "avoid calling students into his office or the storage areas alone.  If a child should come in which he is alone in the gym, he will deal with the matter promptly. At such times, the office door will remain open;" "develop[ing] a system with the students to demonstrate his approval of their actions by positive words or a 'high five' or some other innocuous means;" possibly having a teddy bear available if students need a "hug;" and "not hold[ing] children in his lap for any reason."

"that he was being abusive to (Student No. 7) or that [Student No. 7] was at risk or that anyone was at risk."

As part of her follow-up, Lewis also wrote a letter to the Student No. 7's mother, thanking her for her cooperation in resolving the concern and pledging her own vigilance in closely monitoring the health and well-being of the students in her school. Lewis forwarded to Student No. 7's mother a letter of apology from Brown.[5] Lewis concluded that there was nothing sexual about the incident. She never heard from the mother again.

Less than a week later, on March 6, 1996, she had a phone conversation with the mother of Student No. 8, who reported that her daughter had told her that Brown had done something to make her feel uncomfortable. At a meeting later that same day, Student No. 8 reported to Lewis that Brown had come up behind her and had given her a hug. She said she then went into Brown's office to put something away, and while she was leaning over the desk to look at some photos mounted in his window, he leaned up against her and

_____

[5]The letter, addressed to the parents of Student No. 7, with a copy to Lewis and dated March 1, 1996, read:

> I now realize that what I did was not thoughtful or respectful of the teacher-student relationship. I wholeheartedly assure you that no harm was ever intended to your daughter by my actions.
>
> I will never allow her or any other children to feel uncomfortable around me again. I want to assure you also that all children are safe in my care.

then directed her out.  After questioning by Lewis, Student No. 8 told her that she "thought she felt his private part against her."

The following morning, Lewis spoke with Brown, who denied that he had hugged Student No. 8 in the gym.  He  said that he walked in his office and Student No. 8 was standing at his desk. He said he stood behind her and made "[l]ike a kneading motion or a little tapping motion across her back."  He stated that he took her arms by the elbows and directed her out the door, stating that he was going to be late for bus duty and needed her to move on. Brown denied having leaned against Student No. 8 and said that, if anything, she may have felt the fanny pack he was wearing, but that he did not touch her with his body.

After meeting with Brown, Lewis contacted her immediate supervisor, Area Superintendent Donald Sheldon.  She attested that she thought that Student No. 8's report had a "different element" from the previous concern regarding Student No. 7 because "there was a suggestion of perhaps [Brown's] body part touching the girl." After speaking to Sheldon on the phone, Lewis met with him in person and related both situations involving Student No. 7 and Student No. 8.  Sheldon advised Lewis to contact Alan Barbee, a former police officer with twenty years' police experience,  who had been working for the Fairfax County school system as an investigative specialist since his retirement from the Fairfax

County Police twenty years earlier. Lewis phoned Barbee "right away."

On March 9, 1996, Lewis drafted a memo of warning to Brown.[6] She characterized this memo as a "directive" to Brown that told him exactly where "the line" was and told him "in no uncertain terms" that failure to comply would be "insubordinate" and "would put him at risk of losing his job."

On March 12, 1996, CPS and the Fairfax County Police met with Lewis and Brown at the school. Lewis told CPS and the police about the previous incident involving Brown and Student No. 7, and about the plan of action she had given Brown as a result. At the conclusion of their investigation, CPS indicated to Lewis that they were going to rule Student No. 8's complaint "unfounded." In addition, the police determined that there was nothing sexual about the incident and "dropped themselves out of the case" after meeting with Brown.

On March 13, 1996, Barbee returned the call Lewis had made to him, and she relayed to him the report made by Student No. 8, as well as information relating to the prior incident involving Student No. 7. Barbee spoke to both the police detective and the CPS worker investigating Student No. 8's complaint, who also told him that they believed Brown's actions to have been unintentional.

---

[6]She characterized her previous memo to him as a "plan of action," which was based in "common sense," and was a "reminder," and a document into which she had allowed him input.

The detective concluded that there was no basis for continuing a police investigation because there was no specific allegation of sexual touching or anything that would constitute a criminal offense.

On March 18, 1996, CPS issued a letter to Brown, formally notifying him that Student No. 8's complaint had been ruled "unfounded." Student No. 8's mother and Lewis reached similar conclusions. Based on her own investigation and that conducted by CPS and the police, Lewis was "comfortable that it was incidental and not intentional but not smart." She attested that had she thought Brown was "going to cross that line" or "that he was a risk for children in [her] school," that she "couldn't have kept him at [her] school."

Barbee attested that he did not recommend to Lewis or to anyone else that any disciplinary action be taken as to Brown, nor did he advise Lewis to closely monitor Brown. Barbee did not believe that Brown had sexually abused anyone at the school in 1996. Based on the investigations and resolutions of both the February 22, 1996, and the March 6, 1996, complaint, Lewis also did not conclude that Brown needed closer supervision and monitoring. No further complaints were made against Brown while Sanders was a student at Newington.[7]

_____

[7]Sanders graduated from Newington Forest in June 1998.

- 10 -

Sanders was twenty years old when she sued Lewis.[8] She claimed that beginning around 1995-1996, when she was nine years old and in the fourth grade, she was subjected to "frequent and ongoing physical and sexual touchings by Mr. Brown," and that these touchings continued regularly for the next two years, ceasing only when she graduated and physically left the school at the end of sixth grade in 1998. She asserted that during and after each of the alleged touchings, she "felt shocked, frightened, and unable to respond," she "knew it was bad," it made her uncomfortable at the time, she did not like, and did not understand, what Brown was doing, and felt humiliated, nervous, and fearful. Sanders contended that Brown's conduct caused fear of bodily harm, further offensive sexual contact, and had long-lasting adverse effects throughout her school career, including a decline in her academic performance. Sanders did not complain to anyone about Brown's conduct while she was a student at Newington Forest. She alleged that in April/May 2004, she "began to realize and understand what had happened to her at the hands of Mr. Brown," recognizing the touchings as "abuse," and then reported the alleged abuse. Brown denied having touched Sanders in an inappropriate way.

In October 2000, two years after Sanders left Newington Forest and four years after the incidents involving Students Nos. 7 and 8, the School Board terminated Brown's employment for

---

[8]Sanders' date of birth is January 21, 1986.

- 11 -

unprofessional conduct and insubordination, based upon his failure to comply with Lewis' March 1, 1996, and March 9, 1996, memoranda, and following allegations made by other students in 1999. The 1999 allegations likewise were ultimately determined by the Virginia Department of Social Services to be unfounded. Brown has never been prosecuted or convicted of any crime, including any charge of sexual abuse of Sanders or anyone else.

Lewis claimed, on summary judgment, that she was not deliberately indifferent to a risk that Brown was sexually abusing his students. She further asserted that Sanders' claim against her is barred by the applicable statute of limitations.[9]

The district judge thoroughly reviewed the briefs, arguments, and exhibits of the parties and carefully considered the claims and the evidence before concluding, on the record, that even if Sanders established negligence on Lewis' part with regard to the risk of sexual abuse at the hands of Brown, she failed to reach the high burden of deliberate indifference required to make out a § 1983 claim. We agree with the district court.

We review an award of summary judgment de novo. Higgins v. E. I. DuPont de Nemours & Co., 863 F.2d 1162, 1167 (4th Cir. 1988). Summary judgment is appropriate when there is no genuine issue of material fact, given the parties' respective burdens of

---

[9]Given our disposition of the appeal with regard to the § 1983 claim, we decline to address the statute of limitations argument.

proof at trial.  Fed. R. Civ. P. 56(c); <u>Anderson v. Liberty Lobby,</u>

<u>Inc.</u>, 477 U.S. 242, 247-49 (1986).   In determining whether the

moving party has shown there is no genuine issue of material fact,

a court must assess the factual evidence and all inferences to be

drawn therefrom in the light most favorable to the non-moving

party.  <u>Id.</u> at 255; <u>Smith v. Virginia Commonwealth Univ.</u>, 84 F.3d

672, 675 (4th Cir. 1996).

Supervisory officials may be held liable in certain

circumstances for the constitutional injuries inflicted by their

subordinates.  <u>See</u> <u>Slaken v. Porter</u>, 737 F.2d 368, 372 (4th Cir.

1984).  Such liability is not based on respondeat superior, but on

"a recognition that supervisory indifference or tacit authorization

of subordinates' misconduct may be a causative factor in the

constitutional injuries [the subordinates] inflict on those

committed to their care."  <u>Id.</u> at 372-73.  We have articulated a

three-part test to establish supervisory liability under § 1983:

> (1)   that the supervisor had actual or
>       constructive knowledge that his
>       subordinate was engaged in conduct that
>       posed a pervasive and unreasonable risk
>       of constitutional injury to citizens like
>       the plaintiff;
>
> (2)   that the supervisor's response to that
>       knowledge was so inadequate as to show
>       deliberate indifference to or tacit
>       authorization of the alleged offensive
>       practices; and
>
> (3)   that there was an affirmative causal link
>       between the supervisor's inaction and the

> particular constitutional injury suffered
> by the plaintiff.

Shaw v. Stroud, 13 F.3d 791, 799 (4th Cir. 1994) (citations omitted; internal quotations omitted).

While it is questionable whether Sanders satisfied any of these three elements, the focus of the district court, and the focus on appeal, is on the second element. To establish whether Lewis demonstrated "deliberate indifference" to the presence of the risk of sexual abuse to students by Brown, Sanders must prove that Lewis showed "continued inaction in the face of documented widespread abuses." Slaken, 737 F.2d at 373. "Deliberate indifference is a very high standard – a showing of mere negligence will not meet it." Grayson v. Peed, 195 F.3d 692, 695 (4th Cir. 1999). Accordingly, "a supervisory official who responds reasonably to a known risk is not deliberately indifferent even if the harm is not averted." Baynard v. Malone, 268 F.3d 228, 236 (4th Cir. 2001). For Sanders to overcome summary judgment, she must prove that genuine issues of material fact exist which support her claim that Lewis' actions and failures to act constituted deliberate indifference.

To assess whether Lewis responded reasonably to the risk that Brown was subjecting his female students to sexual abuse, it is helpful to review the actions Lewis took upon receiving the complaints by Student Nos. 7 and 8. It is undisputed, as noted by the district court and as detailed above, that Lewis immediately

- 14 -

responded to both complaints. She conducted her own investigation and inquiry into the complaints lodged against Brown by Student Nos. 7 and 8, reported the allegations to her superiors and other appropriate individuals, and sought their guidance in investigating and handling the situation. It was Lewis who set in motion the chain of events which culminated with the findings of both a police investigation and a social services agency investigation which determined that the complaints against Brown were unfounded. Lewis' reactions to the complaints were immediate, reasonable, and appropriate. She investigated the allegations, meeting with the students' parents, the students, Brown, the Fairfax County police detective, CPS officials, the School Board investigator, and her own supervisor, and took direct and specific actions based on the results of her investigation, which actions included giving Brown both oral and written reprimands and providing direction to Brown relative to the manner in which he was to conduct himself with students. Both complaints were resolved within a matter of days to the satisfaction of the parents involved, and to the satisfaction of the authorities. There is no evidence in this record, or allegation, that Lewis was told to take any further or alternative action with regard to the complaints of Student Nos. 7 and 8 that she refused or otherwise failed to take. As the district court correctly held, while there may have been additional precautions Lewis might have imposed, such as having Brown monitored more

closely, there is no evidence that such actions would have made any difference in this case.[10]  Thus, there is no genuine issue of material fact, construed in Sanders' favor, that demonstrates that Lewis was deliberately indifferent to any risk associated with Brown, and she cannot be held liable under § 1983 to Sanders for Brown's misconduct.

Accordingly, we affirm the district court's order granting the motion for summary judgment in favor of Lewis.  Given that summary judgment was properly granted, the district court was well within its discretion to dismiss without prejudice the state claims against Brown.  We dispense with oral argument because the facts and legal contentions are adequately presented in the materials before the court and argument would not aid the decisional process.

AFFIRMED

---

[10]As noted above, Lewis received no further complaint about Brown during the time Sanders was enrolled at Newington Forest. Moreover, even if Lewis had put Brown on administrative leave pending the results of the independent inquiries by the police and social services relative to the complaints made by Student Nos. 7 and 8, because the results of those investigations were in favor of Brown, Lewis would, presumably, have reinstated Brown prior to his having had any contact with Sanders.