Paul J. SPRATLIN, Plaintiff,

v.

MONTGOMERY COUNTY, MARYLAND, et al., Defendants.

Civ. No. H-89-806.

United States District Court, D. Maryland.

Aug. 14, 1990.

9. If the jury gives inconsistent answers to special interrogatories, the case must be remanded for a new trial. *Willard v. The John Hayward,* 577 F.2d 1009, 1011 (5th Cir.1978).

**1546**

Thomas J. Gagliardo, Takoma Park, Md., for plaintiff.

J. Joseph Curran, Jr., Atty. Gen., David Morgan and C. Frederick Ryland, Asst. Attys. Gen., Baltimore, Md., for State of Md.

Patricia D. Hines, Asst. County Atty., Rockville, Md., for Montgomery County, Md.

## MEMORANDUM OPINION

ALEXANDER HARVEY, II, Chief Judge.

Presently pending in this civil action are defendants' motion for summary judgment and the intervening defendant's motion to dismiss one count of the second amended complaint. Plaintiff has here sued Montgomery County, Maryland (hereinafter the "County") and County police officers Barbara Kunkle and Robert Angelino under 42 U.S.C. § 1983. Compensatory and punitive damages are sought on grounds that defendants allegedly violated plaintiff's constitutional rights when he was arrested and detained for a period of three hours for a psychiatric evaluation.[1] Plaintiff has also asserted that the Maryland statute which permits police officers to prepare an emergency petition seeking a psychiatric evaluation is unconstitutional.

Count VII of the second amended complaint asserted the unconstitutionality of § 10–622(a) of the Health–General Article of the Annotated Code of Maryland (1990 Repl.Vol.). Pursuant to Rule 24(a)(1), F.R.Civ.P. and 28 U.S.C. § 2403(b), the State of Maryland was permitted to intervene to present argument concerning the constitutionality of the statute. As intervenor defendant, the State has filed a motion to dismiss Count VII of the second amended complaint. That motion is presently before the Court as is defendants' motion for summary judgment.

The parties have submitted lengthy memoranda in support of and in opposition to both pending motions. Extensive discovery has been undertaken by the parties, and the record here includes excerpts from depositions and numerous exhibits relied upon by the parties. Oral argument has been heard in open Court. For the reasons to be stated, defendants' motion for summary judgment will be granted, and the intervenor's motion to dismiss will also be granted.

---

1. Compensatory damages in the amount of $500,000 are sought as well as punitive damages in the amount of $1,000,000.

## I

### Facts

In early 1988, the County began to enforce a zoning ordinance in the City of Takoma Park, the effect of which was to displace certain citizens from their homes by converting areas containing multi-family dwellings into single-family districts. As a result of this action, a group entitled Habitants Opposing Mass Evictions (H.O.M.E.) sponsored a number of rallies and sit-ins, some of which occurred at the Executive Office Building (hereinafter the "EOB") located in Rockville, Maryland. Other demonstrations were held at the residences of various County officials, including the home of Sidney Kramer, the County Executive.

On March 21, 1988, H.O.M.E. sponsored a rally at the EOB. Learning of the scheduled event, County police organized a detail of undercover police officers to monitor the rally. Defendants Kunkle and Angelino were assigned to pose as a reporter and a photographer and to stand in the crowd and ensure that no civil unrest or destruction of property occurred.

The County police officers arrived at the rally early in the evening of March 21, 1988. The speakers at the rally focused on the topics of homelessness and evictions and specifically on the ways in which the zoning ordinance might create such problems. One speaker began to chant "Where's Sid" [2] and encouraged the crowd to chant also. At this point, plaintiff was heard by the police officers to yell "Sidney must die." Although only a few people in attendance heard that first outburst, plaintiff later again yelled "Sidney must die" and "Death to Sid Kramer," when the crowd was a little quieter and when many people were able to hear plaintiff's statements. Indeed, the leader of the rally responded: "Well, not that bad, we mean he must go."

Officers Kunkle and Angelino then decided to question plaintiff concerning his threatening statements. Plaintiff readily agreed to speak with the officers, whom he understood to be a reporter and a photographer. When asked why he felt that the County Executive should die, plaintiff responded, "Death would be an appropriate means to end a situation such as this." When questioned further about his statement that "Sid must die," plaintiff responded that he thought "Sid should do the proper thing and commit suicide." Plaintiff also stated that "the time is right in this country for a revolution."

Besides making these comments, plaintiff stated that he had attended a demonstration at the residence of the County Executive approximately one month prior to the rally. When asked his opinion regarding the zoning ordinance, plaintiff once again responded "Sidney must die" and later told the officers that "Sidney is a stupid man."

After the rally, the officers began to run a background check on plaintiff. That investigation revealed that plaintiff had engaged in two prior incidents of disruptive behavior. In 1985, plaintiff had been arrested in the District of Columbia when he became loud and disruptive in a public library. Those charges were subsequently dismissed. On November 30, 1987, plaintiff had gone to the Washington Adventist Hospital seeking mental health treatment, had become loud and disruptive, and had been combative with a security officer. Takoma Park police were called on that occasion, and although plaintiff was temporarily removed from the hospital, no arrest was made at the time.

In November of 1987, plaintiff had been evaluated by two doctors at the Washington Adventist Hospital and also by doctors at Springfield State Hospital. The doctors at Washington Adventist made a preliminary diagnosis that plaintiff suffered from paranoid schizophrenia, depression, and suicidal thoughts. Plaintiff was then transferred to Springfield State Hospital where, after a more thorough psychiatric evalua-

---

**2.** The reference was obviously to County Executive Sidney Kramer who was out of town that evening.

tion, he was released. The records from Springfield State Hospital revealed that, although plaintiff bordered on "magical thinking" and had admitted to a marijuana abuse problem, he was not homicidal or suicidal.

After obtaining this information concerning plaintiff's background, defendants Kunkle and Angelino met with other members of the County police. The decision was then made to prepare and present to a state judge a petition for evaluation of the plaintiff pursuant to § 10–620 *et seq.* of the Health–General Article of The Annotated Code of Maryland. On March 23, 1988, Officer Kunkle prepared and signed the petition. The petition was then presented to and approved by Judge Paul McGuckian of the District Court for Montgomery County. In granting the petition, Judge McGuckian found that there was probable cause to believe that Spratlin, as an "emergency evaluee" under § 10–620, had shown symptoms of a mental disorder and that there appeared to be "clear and imminent danger" of his doing bodily harm to another person. It was ordered that Spratlin be taken into custody by a peace officer [3] and transported to the emergency room of the nearest hospital for examination and emergency care and treatment if necessary. The Court's Order of March 23, 1988 further provided that the evaluee be examined by a physician within six hours and that he could not be detained for longer than thirty hours.

Acting pursuant to the Court Order, other County officers served the petition and the Order on plaintiff Spratlin and arrested him. Plaintiff was then handcuffed and transported to the Washington Adventist Hospital, where he was detained for no more than three hours. Doctors at the hospital, after examining plaintiff, determined that he had no homicidal or suicidal tendencies and that he presented no danger to other individuals. Plaintiff was then released by the hospital with instructions that he seek further counselling and stay away from political rallies. There is no claim in this case that plaintiff suffered any physical injury during the brief period of his detention.

The Montgomery County Police Department has issued Departmental Directive 88–06 which essentially parallels state law concerning the circumstances under which a petition for an emergency psychiatric evaluation should be sought. The record in this case further discloses that it is the common practice of the County to have its officers present such a petition to a judicial officer for review before taking a subject into custody, as was done in plaintiff's case. State law does not require that a police officer first present a petition to a court for review before detaining an emergency evaluee, although a lay person must do so. *See* § 10–623(a).

## II

### *The Claims*

Following various preliminary proceedings in this case, plaintiff filed a second amended complaint containing seven counts. Count I alleges that defendants Kunkle and Angelino violated plaintiff's First, Fourth, Fifth and Fourteenth Amendment rights and are therefore liable in damages under 42 U.S.C. § 1983. Plaintiff asserts in Count I that defendants Kunkle and Angelino acted with intent to chill plaintiff's First Amendment rights to free speech and assembly and that their actions constituted an unreasonable search and seizure under the Fourth Amendment. Count II alleges that the individual defendants acted with the "knowledge, consent and approval" of Montgomery County officials and that liability must therefore be imposed upon the County as well. Counts III through VI, which allege various claims under Maryland law, have been dismissed at the request of plaintiff.[4] Count VII asserts that § 10–622 of the Health–General Article of the Maryland Code is unconstitutional because it does not provide an emergency evaluee notice or an opportunity to be heard.

---

**3.** The statute defines "peace officer" as including a county police officer. *See* § 10–620(f).

**4.** An Order was entered on July 3, 1990 dismissing Counts III, IV, V and VI without prejudice.

Defendants seek summary judgment as to Count I and II. The State of Maryland, as intervenor defendant, has filed a motion to dismiss Count VII claiming that the statute is constitutional. Plaintiff filed no opposition to that motion. However, at the hearing held on July 3, 1990, counsel for plaintiff indicated that he intended to pursue the constitutionality issue only with respect to whether the language "reason to believe" in the statute must be the equivalent of "probable cause" as used in the context of Fourth Amendment searches and seizures.[5] Inasmuch as that claim was not asserted in Count VII of the second amended complaint and inasmuch as plaintiff did not oppose the State's motion directed to the allegations of said Count VII, the State's motion to dismiss Count VII will be granted.[6]

### III

#### The Maryland Statute

Section 10–622(a) of the Health–General Article of the Maryland Code provides as follows:

A petition for emergency evaluation of an individual may be made under this section only if the petitioner has reason to believe that the individual has a mental disorder and that there is clear and imminent danger of the individual's doing bodily harm to the individual or another.

Md. Health–Gen. Code Ann. § 10–622(a) (1990 Repl.Vol.).

The express purpose of the statute is to provide a method whereby state officials may determine, by way of the temporary detention of an individual, whether such individual presents a threat to the general public. The statutory scheme sets a 6–hour limit for examination of an emergency evaluee and a 30–hour limit for the evaluee's detention without a hearing. § 10–624(b)(2) and (b)(4).

If the preliminary evaluation indicates that an evaluee should be detained for a longer period of time, a detention hearing must be held § 10–632. It is apparent from a review of the statutory language that it was carefully drawn and intended to intrude only minimally upon the rights and interests of a citizen being detained.

### IV

#### Summary Judgment Principles

One of the purposes of Rule 56, F.R.Civ. P., is to require a plaintiff, in advance of trial and after a motion for summary judgment has been filed and supported, to come forward with some minimal facts to show that a defendant may be liable under the claims alleged. See Rule 56(e). Moreover, " '[a] mere scintilla of evidence is not enough to create a fact issue; there must be evidence on which a jury might rely.' " Barwick v. Celotex Corp., 736 F.2d 946, 958–59 (4th Cir.1984), quoting Seago v. North Carolina Theatres, Inc., 42 F.R.D. 627, 640 (E.D.N.C.1966), aff'd, 388 F.2d 987 (4th Cir.1967). In the absence of such a minimal showing, a defendant should not be required to undergo the considerable expense of preparing for and participating in a trial. As Judge Winter said in Bland v. Norfolk and Southern Railroad Company, 406 F.2d 863, 866 (4th Cir.1969):

While a day in court may be a constitutional necessity when there are disputed questions of fact, the function of a motion for summary judgment is to smoke out if there is any case, i.e., any genuine dispute as to any material fact, and, if there is no case, to conserve judicial time and energy by avoiding an unnecessary trial and by providing a speedy and efficient summary disposition.

In two cases decided in 1986, the Supreme Court clarified and expanded the principles applicable to a trial court's consideration of a motion for summary judg-

---

**5.** Also, on July 3, 1990, plaintiff filed a motion to add defendants. This motion was denied by the Court because discovery had been completed some months before and because the motion had not been timely filed as required by the Scheduling Order of August 21, 1989.

**6.** Moreover, the Court has in any event reviewed the authorities cited by the State in its memorandum and has concluded that § 10–622 is on its face constitutional.

ment filed under Rule 56. *Anderson v. Liberty Lobby,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

In *Anderson,* the Supreme Court held that the standard for granting a motion for summary judgment under Rule 56 is the same as that for granting a directed verdict under Rule 50, F.R.Civ.P. 477 U.S. at 250–51, 106 S.Ct. at 2511–12. The Court explained this standard as follows:

> [T]he judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented. *The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient;* there must be evidence on which the jury could reasonably find for the plaintiff.

*Id.* at 252, 106 S.Ct. at 2512 (emphasis added).

In *Catrett,* the Court held that there is "no express or implied requirement in Rule 56 that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim." 477 U.S. at 323, 106 S.Ct. at 2553 (emphasis in original). In reaching this result, the Court observed:

> Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed "to secure the just, speedy and inexpensive determination of every action." Fed. Rule. Civ.P. 1; see Schwarzer, Summary Judgment Under the Federal Rules: Defining Genuine Issues of Material Fact, 99 F.R.D. 465, 467 (1984).... Rule 56 must be construed with due regard not only for the rights of persons asserting claims and defenses that are adequately based in fact to have those claims and defenses tried to a jury, but also for the rights of persons opposing such claims and defenses to demonstrate in the manner provided by the

Rule, prior to trial, that the claims and defenses have no factual basis.

*Id.* at 327, 106 S.Ct. at 2555.

In *Felty v. Graves–Humphrey Co.,* 818 F.2d 1126 (4th Cir.1987), the Fourth Circuit discussed the Supreme Court's holdings in *Anderson* and *Catrett.* Judge Wilkinson emphasized in *Felty* that trial judges have "an affirmative obligation ... to prevent 'factually unsupported claims and defenses' from proceeding to trial." *Id.* at 1128 (quoting *Celotex, supra,* 477 U.S. at 323–24, 106 S.Ct. at 2553).

Applying these principles to the facts of record here, this Court concludes that defendants' motion for summary judgment must be granted. Since the facts of record here "taken as a whole could not lead a rational trier of fact to find for the nonmoving party," summary judgment is appropriate. *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

## V

### *Discussion*

#### (a)

#### *Liability of the Police Officers*

Defendants contend that the police officers acted reasonably under the circumstances here and that defendants Kunkle and Angelino are entitled to qualified immunity because the law regarding emergency psychiatric evaluations is not clearly established. While the Supreme Court has held that a defendant is entitled to qualified immunity if the pertinent law is not clearly established and if a police officer would not have known that his conduct violated a plaintiff's constitutional rights, *Harlow v. Fitzgerald,* 457 U.S. 800, 806, 102 S.Ct. 2727, 2732, 73 L.Ed.2d 396 (1982), it is not necessary in this case to address that issue. The facts of record here demonstrate as a matter of law that Officers Kunkle and Angelino acted reasonably under the circumstances.[7]

---

**7.** The statute specifically exempts civil liability under state law of a police officer who acts in

good faith and with reasonable grounds in sub-

In its recent decision in *Graham v. Connor*, 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989), the Supreme Court held that claims that law enforcement officials have violated Fourth Amendment rights are to be reviewed under an "objective reasonableness" standard. *Graham*, 109 S.Ct. at 1867. This standard of reasonableness requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion. *Tennessee v. Garner*, 471 U.S. 1, 8, 105 S.Ct. 1694, 1699, 85 L.Ed.2d 1 (1985) (citations omitted).

The objective standard enunciated by the Supreme Court in *Graham* does not require that an official take the most reasonable course of action suggested by a particular set of circumstances. A police officer would not be immune from suit if it is obvious when the facts are viewed on an objective basis that no reasonably competent officer would have concluded that a warrant should issue; however, if officers of reasonable competence could disagree on the question, such a suit may not be maintained. *Malley v. Briggs*, 475 U.S. 335, 341, 106 S.Ct. 1092, 1096, 89 L.Ed.2d 271 (1986).

The reasonableness of the actions of police officers in intruding on the Fourth Amendment rights of a citizen is not to be judged with the 20/20 vision of hindsight; rather, a court must consider the fact that police officers often must make judgments in circumstances that are uncertain and rapidly evolving. *Graham*, 109 S.Ct. at 1872. Therefore, the question of whether officers acted reasonably may be answered only after careful attention to the facts and circumstances of each particular case. *Id.; Brooks v. Pembroke City Jail*, 722 F.Supp. 1294, 1298 (E.D.N.C.1989), citing *Martin v. Gentile*, 849 F.2d 863, 868 (4th Cir.1988).

Following its review of the record in this case, this Court finds and concludes as a matter of law that defendants Kunkle and Angelino acted reasonably under the circumstances confronting them. First, defendants observed plaintiff at the rally and heard him make repeated statements threatening the life of County Executive Kramer. When asked his opinion of the zoning ordinance, plaintiff replied "Sid must die," indicating that he held the County Executive personally responsible for the effects of the disputed ordinance. Defendants were aware of the fact that plaintiff knew the location of the County Executive's home because he had previously been there. Plaintiff also knew that the County Executive was presently out of town, but would be returning shortly.[8]

The police officers did not act solely on the basis of plaintiff's threatening statements. Rather, a background check was conducted by the officers to determine if plaintiff had previously engaged in violent or disruptive action and whether there was evidence that plaintiff might be suffering from a mental disorder. This investigation revealed that just a few months prior to the rally, plaintiff had sought mental health treatment and that he had become agitated and disruptive while waiting at the hospital. Medical records indicated that plaintiff had admitted to hearing voices and had been very depressed and possibly suicidal. Individuals who had observed plaintiff in the Washington Adventist Hospital in November, 1987 stated that he had then appeared capable of harming himself or others.

Plaintiff argues that defendants did not have reason to believe that plaintiff presented a "clear and imminent danger" to the welfare of the County Executive. The facts of the case reveal, however, that defendants had ample reason to believe that such a danger in fact existed. It was not necessary for defendants to wait until the County Executive had returned to his home and a violent act committed before an emergency petition were sought under the statute. Plaintiff had made repeated state-

---

mitting a petition for an emergency evaluation. *See* § 10–629.

8. County Executive Kramer returned home on March 23, 1988, the same day that plaintiff was taken to be psychiatrically evaluated.

ments indicating his desire that the County Executive should die. Moreover, the officers had determined that plaintiff in the recent past had been physically disruptive at a hospital and had been diagnosed as suffering from paranoid schizophrenia and depression as well as having suicidal thoughts. Under these circumstances, it was reasonable for the police officers to request a state court to have plaintiff examined under applicable provisions of state law. Indeed, the statute did not require that the police officers secure the approval of a court before detaining the plaintiff. That they decided in any event to submit the matter to the District Court judge is further evidence of the reasonableness of the action taken by them.

Significantly, the state judge agreed with the police officers that the facts recited were sufficient under the statute, and the state judge ordered that a psychiatric examination be undertaken to determine if plaintiff constituted an imminent threat to others. The period of detention was brief (no more than three hours), and plaintiff was not physically injured during his arrest and examination. When it was determined that plaintiff did not pose an imminent threat to the County Executive, he was released. This brief intrusion on plaintiff's Fourth Amendment rights is outweighed by defendants' governmental interest in protecting the well-being of a public official.

▮ Nor did defendants' actions violate plaintiff's First Amendment rights. At the rally, plaintiff readily consented to being interviewed by persons believed by him to be representatives of the press. Nothing said by Officers Kunkle and Angelino at the rally in any way "chilled" plaintiff's First Amendment right to speak out in opposition to the County ordinance. Moreover, his later detention and psychiatric evaluation did not constitute action by the police officers which "chilled" plaintiff's right to make legitimate comments on matters of public concern.[9] However, plaintiff

had no right under the First Amendment to threaten the life of a public official inasmuch as speech of that sort clearly is not constitutionally protected. *U.S. v. Howell,* 719 F.2d 1258, 1261 (5th Cir.1983), *cert. denied,* 467 U.S. 1228, 104 S.Ct. 2683, 81 L.Ed.2d 878 (1984).

On the record here, this Court concludes that the actions undertaken by defendants Kunkle and Angelino between March 21 and March 23, 1988 fully comported with the applicable standard of reasonableness articulated by the Supreme Court in *Graham,* and that such actions did not violate plaintiff's First Amendment rights. Summary judgment in favor of defendants Kunkle and Angelino will accordingly be entered as to Count I of the second amended complaint.

(b)

*Liability of the County Under § 1983*

In Count II of the second amended complaint, plaintiff seeks a recovery from the County under § 1983. Plaintiff asserts that unconstitutional acts of defendants Kunkle and Angelino were done with the knowledge, consent and approval of officials of the Montgomery County Police Department and the Montgomery County government. It is further asserted that such acts were done in accordance with policies, practices and customs of the County and that as a direct and proximate result plaintiff has sustained injury and damage.

The short answer to plaintiff's claim against the County alleged in Count II is that the County Police officers did not act unreasonably in seeking a psychiatric evaluation of the plaintiff and that they did not violate plaintiff's First Amendment rights. This Court has concluded herein as a matter of law that the actions of defendants Kunkle and Angelino were objectively reasonable on the days in question and not in violation of the First Amendment. Since the County officers acted reasonably and since plaintiff's First Amendment rights were not infringed by them, the County cannot be held responsible for their actions,

---

**9.** It was medical personnel and not the police officers who told him to stay away from politi-

cal rallies in the future.

whether or not they were done in accordance with a policy or practice of the County.

 Even if the police officers had acted improperly, the County would still not in this case be responsible for their actions. A municipality cannot be found liable in a § 1983 action under a theory of *respondeat superior*. *Monell v. New York City Dep't. of Social Services*, 436 U.S. 658, 694, 98 S.Ct. 2018, 2037, 56 L.Ed.2d 611 (1978). The record here discloses no County policy, custom or usage which directly commanded these police officers to commit constitutional violations which led to injury and damage to plaintiff. What occurred here constituted merely a single incident which would not suffice to amount to a municipal custom and which would not constitute deliberate indifference by the County to unconstitutional activity. *See Spell v. McDaniel*, 824 F.2d 1380, 1391 (4th Cir. 1987).

Plaintiff argues that the County is liable because Chief Brooks, the highest ranking official in the County Police Department, testified that it was his decision to have the officers seek the emergency petition. This contention is without merit. Liability of the municipality itself does not automatically attach to every decision made by a municipal officer charged with policymaking authority. *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481, 106 S.Ct. 1292, 1299, 89 L.Ed.2d 452 (1986). On the contrary, municipal liability attaches only where "a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." *Pembaur*, 475 U.S. at 483–84, 106 S.Ct. at 1300. In this particular case, the decision of Chief Brooks under the unique circumstances here did not constitute unconstitutional County policy concerning the filing of petitions seeking emergency psychiatric evaluations. The action taken with regard to plaintiff was an episodic event which did not implicate the County itself. Summary judgment in favor of the County will therefore also be granted as to Count II.

For the reasons stated herein, defendants' motion for summary judgment will be granted and the motion of the State of Maryland to dismiss Count VII of the second amended complaint will also be granted. A separate Order will be entered by the Court.