**Erin Kathleen JONES, Plaintiff,**

v.

**Michael Dennis ZIEGLER, et al., Defendants.**

**Civ. No. H–93–771.**

United States District Court, D. Maryland.

Aug. 3, 1995.

---

William F. Gately and Howell, Gately, Whitney & Carter, Towson, MD, for plaintiff.

John F. Breads, Jr., Assistant County Attorney, Annapolis, MD and Ronald A. Silkworth, Glen Burnie, MD, for defendants.

ALEXANDER HARVEY, II, Senior District Judge.

During the early morning hours of November 15, 1990, Erin Kathleen Jones ("Jones") was raped by Michael D. Ziegler ("Ziegler") while he was on duty as an Anne Arundel County Police Officer. Following a three-day trial in this Court in September of 1994, a jury returned a verdict finding for plaintiff Jones both on her claim against defendant Ziegler asserted under 42 U.S.C. § 1983 and on her claim of battery asserted against him under state law. Compensatory damages in the amount of $650,000 and punitive damages in the amount of $400,000 were awarded by the jury to plaintiff Jones. An interim judgment to such effect was entered by this Court on September 21, 1994.[1] In this second stage of this civil action, plaintiff Jones is seeking to hold Anne Arundel County and three of its police chiefs also legally responsible for Ziegler's sexual assault.

In her second amended complaint, plaintiff has sued Anne Arundel County (the "County"), Chief of Police George W. Wellham, III ("Wellham"), former Chief of Police Maxwell V. Frye, Jr. ("Frye"), former Chief of Police William S. Lindsey ("Lindsey") and "Presently Unknown and Undetermined Supervisory Police Officers."[2] At an early stage of this case, proceedings against defendants other than Ziegler were bifurcated, and discovery relating to plaintiff's claims against those other defendants was stayed. After the entry of judgment against defendant Ziegler, plaintiff filed an amended complaint and a second amended complaint, and discovery proceeded in this second stage of the case pursuant to the Court's Revised Scheduling Order of November 18, 1994. Extensive discovery has now been undertaken by the parties, and the remaining defendants have now filed a motion seeking summary judgment as to all of plaintiff's remaining claims against them. Also pending at this time is plaintiff's motion to compel production of documents and the County's motion to dismiss Count V of plaintiff's Second Amended Complaint.

Memoranda, affidavits, excerpts from depositions and numerous exhibits both in support of and in opposition to the pending motions have been submitted by the parties and reviewed by the Court. Oral argument has been heard in open Court. Following its review of the voluminous record in this case, the Court has concluded that defendants' motion for summary judgment must be granted, and that judgment at this second stage of these proceedings must be entered in favor of each of the remaining defendants, with costs. In addition, the County's motion to dismiss Count V of plaintiff's second amended complaint will be granted, and plaintiff's motion to compel production of documents will be denied as moot.

I

*Plaintiff's Remaining Claims* [3]

Count II of plaintiff's second amended complaint is brought under 42 U.S.C. § 1983 against the County and defendants Wellham, Lindsey and Frye. Defendant Wellham was Chief of Police of the County in November of 1990 when Ziegler raped Jones. Defendant Frye was Chief of Police of the County in 1979, and defendant Lindsey was Chief of Police of the County in 1984. In Count II, it is alleged that the County had a "policy of minimal disciplinary action, regarding male police officers" which "encouraged" defen-

---

1. That judgment is not as yet final, inasmuch as other claims in this case remained open at the time of its entry. *See* Rule 54(b), F.R.Civ.P.

2. Despite extensive discovery, plaintiff has not at this late date claimed that any other identified Anne Arundel County police officers are legally responsible for her rape. Plaintiff's claims against "Presently Unknown and Undetermined Supervisory Police Officers" will accordingly be dismissed.

3. In Counts I and III of her complaint and amended complaints, plaintiff alleged a § 1983 claim and a claim of battery under state law against defendant Ziegler. As noted, at an early stage of this litigation, judgment was entered in favor of plaintiff against defendant Ziegler as to these two claims. Count I is therefore no longer pending before the Court, and Count III remains open only as to plaintiff's claim against the County.

dant Ziegler to believe that he could violate plaintiff's constitutional rights with impunity. It is further alleged that the County's policy, custom and practice was implemented and/or condoned by each of the individual police chiefs named as defendants, each of whom was acting in his official capacity as final policymaker for the Anne Arundel County Police Department during his respective tenure. In Count II, plaintiff has also asserted claims of supervisory liability against each of the police chief defendants and has alleged that each is personally liable to plaintiff for failing to remove defendant Ziegler from active duty despite having actual knowledge of his history of sexual misconduct. Defendants Wellham, Frye and Lindsey have therefore been sued in this case both in their official capacities and in their individual capacities.

In addition to asserting a claim of battery under state law against defendant Ziegler, plaintiff in Count III of the second amended complaint is apparently seeking a recovery from the County under the same theory. In Count IV, plaintiff seeks a judgment against the County and the police chiefs under state law for their negligent retention of Ziegler as a police officer. Count V is based on a theory of indemnification. In that Count, plaintiff has requested that upon entry of judgment in this proceeding "the Court direct Anne Arundel County, Maryland to fully indemnify each individual defendant against whom judgments for compensatory or punitive damages have been entered and to fully indemnify these individuals for any and all awards ... or in the alternative to fully satisfy such judgments by direct payment to the plaintiff." Plaintiff claims this right of indemnification under Title 5 of the Anne Arundel County Code and under a provision of the applicable collective bargaining agreement between the County and the Union which represents its police officers.

4. It is apparent that there are indeed disputed issues of fact in this case. However, these disputes do not involve *material* facts and do not preclude the entry of summary judgment in favor of the defendants. Even accepting as true plaintiff's version of the events in question, this Court has concluded that plaintiff has failed to show that the defendants may be liable under any of the § 1983 claims asserted. "Accordingly, the

## II

### Background Facts

In seeking to impose liability on the County and on the police chiefs named as defendants, plaintiff relies essentially on two prior incidents of alleged sexual misconduct of Ziegler. The first such incident occurred in 1979 and was based on allegations of one Brenda Forsythe. The second such incident occurred in 1984 and was based on allegations of one Pamela Laughlin. In light of the critical importance of these two incidents to the claims asserted by plaintiff at this second stage of these proceedings, the Court's recitation of facts herein must necessarily be extensive. Viewing the record and all reasonable inferences therefrom in the light most favorable to the plaintiff, the relevant facts are as follows.[4]

#### (a)

#### The 1979 Incident

At approximately 2:00 p.m. on August 27, 1979, Brenda Forsythe appeared at the Anne Arundel County Police Headquarters and reported that she had been raped in her apartment earlier that morning by an unidentified County police officer. Forsythe's charge was immediately brought to the attention of Chief of Police Maxwell Frye, who then spoke directly with Forsythe. Frye summoned Sergeant William Chaplin, head of the Crimes Against Persons Unit, and directed him to initiate an investigation into Forsythe's allegations.

Forsythe had requested that she be permitted to give her statement to a female officer, and Chaplin accordingly assigned Detective Susan Benson,[5] who worked in the Sexual Assault Unit, to conduct the investigation. After taking a brief statement from Forsythe, Benson transported her to North

facts summarized below, where disputed, reflect plaintiff's version of the events to the extent it is supported by affidavits, depositions or other documentary evidence." *Magnuson v. Peak Technical Servs.*, 808 F.Supp. 500, 504 (E.D.Va.1992).

5. Benson has since married and taken the surname of March.

Arundel Hospital, where Forsythe was examined by her own gynecologist. Although he found no evidence of trauma to the vaginal area, the gynecologist did observe two small bruises on Forsythe's right breast. During the course of the examination, pubic hairs and residual sperm were collected and marked as physical evidence by Benson. Prior to the examination, Forsythe had admitted that she had engaged in sexual intercourse with her boyfriend approximately one hour prior to her contact with the unidentified officer. Forsythe and Benson then went to Forsythe's residence, where further evidence was turned over to Benson, including sheets, pillow cases, and a towel which had allegedly been used by the officer.

The following day, Forsythe returned to the police station and gave a lengthy formal statement to Benson. In essence, Forsythe stated that she had allowed the police officer into her apartment around 4:00 a.m. on August 27, after he asked her if he could use her telephone. The officer had been in the area with another officer responding to an unrelated domestic call when Forsythe had approached them and asked for their assistance with a man who was loitering near her apartment. When they arrived at her apartment building, one of the officers questioned the man who had been loitering and the other officer asked Forsythe if he could use her telephone. As the first officer left the area with the loiterer, the second officer and Forsythe entered her apartment.

After that officer had used the telephone, he asked Forsythe if she knew how to remove blood stains from a shirt, since he had gotten blood on his uniform in the course of the domestic call with which he had been dealing earlier. Forsythe told the officer to remove his shirt, and she would try to get the blood out. After he had been offered a soda by Forsythe, the officer took his holster off and removed his gun from the holster, laying it on a nearby chair. He then removed his shirt and, while Forsythe attempted to clean it, he sat on the sofa and took his shoes off. When Forsythe returned with the officer's shirt, he began kissing her and fondling her leg. He then asked her if she had ever been in trouble. When Forsythe re-

plied that she had not, he told her that he would charge her with prostitution if she did not go to bed with him. The officer and Forsythe then went into the bedroom and removed their clothing. At the outset, the officer attempted to have Forsythe perform fellatio, but she refused. Thereafter, they engaged in sexual intercourse, and the officer completed the act by ejaculating. When the officer got up to leave, he told Forsythe that his name was "Mike" and that she could call him at the station if she needed him. The officer then left.

After taking Forsythe's statement, Benson showed Forsythe a photographic lineup of all the uniformed officers who had been on duty at the time of the alleged incident. Forsythe positively identified Officer Michael Ziegler as the individual who had sexually assaulted her. Forsythe was then transported to the Maryland State Police Barracks in Annapolis, where she was given a polygraph examination by Sergeant Lloyd White of the Maryland State Police. At the conclusion of the examination, Sergeant White stated his opinion that Forsythe was being truthful concerning the events described hereinabove.

Further investigation revealed that on the date in question Officer Ziegler had been in the area of Forsythe's apartment for some period of time after 2:00 a.m., assisting Police Officer Stratton with a domestic call. A check of police dispatch records revealed that Officer Ziegler had not made any radio transmissions on that date between 2:50 a.m., when he first arrived on the scene to assist Officer Stratton, and 4:27 a.m., when he cleared with Officer Stratton and left the area.

The next day, August 28, 1979, Chief Frye sent a memorandum to Ziegler informing him that, based upon Forsythe's complaint, he was being immediately suspended from duty without pay, pending further investigation. That same day, Sergeant William Pantall of the Police Department's Special Investigations Unit sent a memorandum to Ziegler advising him that an internal investigation was being undertaken and that Ziegler was to report to headquarters on August 31 for an interview.

The following day, Chaplin summoned Ziegler to police headquarters to be interviewed. Ziegler read and acknowledged that he understood his *Miranda* rights. When questioned, Ziegler stated that he had responded to the original domestic call and that he had gotten blood on his shirt in the course of handling that call. After making this statement, Ziegler requested that he be permitted to consult with an attorney and indicated that he wished to remain silent until he had done so. Before the interview was terminated, both head and pubic hair samples were collected from Ziegler.

On August 30, 1979, Chief Frye sent a memorandum to all personnel, advising that Ziegler was under investigation for an alleged sexual assault. That memorandum stated that Ziegler had been suspended pending the outcome of a "thorough and possibly lengthy" investigation into these charges. The following day, the physical evidence which had been collected by Benson and others in the course of the investigation was transported to the Maryland State Police Laboratory for analysis.

On September 4, 1979, a meeting was held at the office of Warren B. Duckett, who was then State's Attorney for Anne Arundel County.[6] Present at the time were Duckett, Deputy State's Attorney Frank Weathersbee, Chaplin and Benson. During this meeting, the case against Ziegler was discussed at some length, and the ultimate decision made by the State's Attorney was not to prosecute Ziegler.

Duckett, Chaplin and Benson have each been deposed in this case. Of these, only Benson had any significant recollection of this meeting which was held more than fifteen years ago. Benson has testified unequivocally that her entire investigative file, including in particular the results of the polygraph test conducted by Sergeant White and the fact that Ziegler had asserted his right to remain silent when questioned about the incident, was available at the meeting and was discussed and reviewed by all of those present, including State's Attorney Duckett. Benson further testified that, although she personally believed at the time that the evidence warranted the filing of charges of second degree rape against Ziegler and although she argued in favor of the filing of such charges, the "consensus" reached at the meeting was that the case fell into a "gray area" and that the evidence probably was insufficient to obtain a conviction. According to Benson, Duckett "communicated to us that he did not feel it was a winnable prosecuteable [*sic*] case." In her statement, Forsythe had said that the officer who assaulted her did not threaten her with physical harm, and it was Duckett's belief that "there was an indication that [Forsythe's] perceptions of fear didn't necessarily fit actual threats physically to her safety."

By letter dated September 6, 1979, Duckett notified Chief Frye that he had met with Weathersbee, Chaplin and Benson regarding the allegations against Ziegler and that "[a]s a result of a thorough review of all the facts pertaining to the incident it is our considered opinion that there is insufficient evidence to warrant any criminal charges against Officer Ziegler." Duckett further stated in his letter that he found "no cause to present any evidence regarding this matter before the Grand Jury and thus consider the matter closed as it relates to potential criminal prosecution."

Meanwhile, the interview of Ziegler which had been scheduled by Sergeant Pantall for August 31, 1979 had been continued at Ziegler's request until September 7. On that date, Ziegler appeared for the interview accompanied by two attorneys and requested a meeting with Chief Frye. The requested meeting was held with Ziegler, Frye, Pantall, and Ziegler's attorneys in attendance. At that meeting, Ziegler offered to waive his right to a hearing before a departmental board and agreed to accept any punishment which Chief Frye deemed appropriate. A written waiver of rights was then executed by Ziegler and presented to Chief Frye.

After reviewing the case, Chief Frye imposed the following disciplinary sanctions against Ziegler: (1) a suspension without pay for a period of thirty days; (2) a transfer to the Department's Telephone Reporting Ser-

---

6. Duckett is presently a Judge of the Circuit Court for Anne Arundel County.

vice; and (3) the loss of his personal patrol vehicle. There was no indication by Chief Frye at the time whether the transfer was to be permanent or whether it was intended to be only for a limited period of time. In addition, Ziegler was ordered by Chief Frye to contact the departmental chaplain for counseling. These sanctions were formally communicated to Ziegler by way of a memorandum to him from Chief Frye dated September 7, 1979.

At his deposition, Frye testified concerning the role which the September 6, 1979 letter from Duckett had played in his decision to impose these sanctions against Ziegler:

> Certainly that letter would have some bearing on my decision. It's obvious in the letter that the State's Attorney's office had insufficient evidence, or had cause not to prosecute Officer Ziegler criminally.
>
> My office and my responsibility is administrative matters within the police department. Taking all these together, I assigned the penalty that I did.

On September 27, 1979, Ziegler completed his suspension and was, effective that date, assigned by Chief Frye from the Line Division to the Services Division, Telephone Reporting Public Information Station. On June 4, 1980, Chief Frye directed a letter to Ziegler advising him that, effective June 6, he would be reassigned from the Services Division to the Line Division, effectively restoring Ziegler to full time street duty.

### (b)

### *The 1984 Incident*

On the evening of August 14, 1984, Pamela Laughlin reported to the Anne Arundel County Police Department that some five days earlier she had been raped at her apartment by an individual whom she had known for a short time and that her alleged rapist had just returned to her apartment that night and exposed himself. The officers who responded to the scene on August 14 were Henry Affeldt and Michael Ziegler.

The following day, Laughlin received a telephone call from the alleged rapist, who said that he was going to visit her again that night. Laughlin again contacted the police. Among the officers who responded to that call was Sergeant Walter Fennington. Later that evening, Fennington and other officers arrested one Edwin Canino when he attempted to force his way into Laughlin's apartment. Charges were filed against Canino for breaking and entering and for possession of a controlled dangerous substance. Thereafter, Canino was also charged with raping Laughlin on August 9, 1984.

In the course of his investigation, Fennington learned from Laughlin that she had not initially reported the alleged rape on August 9 because of her fear of reprisal, but that she had later reported it to the police on August 14 when the alleged rapist had returned to her apartment and exposed himself. However, Fennington was unable to locate in Police Department files any police report or other record relating to the August 14 incident. After determining the identity of the officers who had responded to Laughlin's call of August 14, Fennington contacted Ziegler and Affeldt to determine why no report had been filed.

Fennington learned from Affeldt that he had been the first to arrive on the scene on August 14, that Ziegler had arrived soon thereafter and that Ziegler had told Affeldt that he would handle the case. Ziegler confirmed Affeldt's statement and explained to Fennington that he had not filed a report because Laughlin was at the time not sure whether she wished to prosecute. Ziegler subsequently denied that Laughlin ever told him that she had in fact been raped. Ziegler further told Fennington that it had been his intention to follow up with Laughlin the following evening and to file a report "if [she] wanted him to."

As a result of Ziegler's violation of departmental rules and regulations requiring the preparation and filing of a report concerning an incident like that of August 14, 1984, the matter was referred by Fennington to Detective Charles R. Blevins of the Internal Affairs Unit. Blevins then conducted an investigation which ultimately led to the filing of administrative charges against Ziegler. In the course of his investigation, Blevins twice interviewed Laughlin regarding these matters. Near the end of her first interview, Laughlin told Blevins that at one point on

August 14 Ziegler had attempted to put his arms around her to comfort her and that later, when Ziegler got up to leave her apartment after having discussed with her for some two hours her problems with Canino, Ziegler "pulled me over towards him, and you know, I, that's when I sat back down on the arm of the sofa like, kind of like pushing myself away from him." Laughlin also informed Blevins that she had told Ziegler that she did not want a report to be made that she had been raped.

Blevins' second interview of Laughlin occurred on November 6, 1984, and was conducted for the specific purpose of clarifying the nature of the physical contact which allegedly had occurred between Laughlin and Ziegler on August 14. In that second interview, Laughlin told Blevins that she thought on the night in question that Ziegler stayed in her apartment for some two hours because he "just wanted somebody to pass the time with" and that the physical contact which had occurred between herself and Ziegler that night had not been "sexual" in nature. Blevins also determined in the course of his investigation that Ziegler had asked that both Affeldt and Laughlin not tell the truth to investigators concerning the length of time that he had remained at Laughlin's apartment and concerning whether or not Laughlin had told the officers that she had been raped.

A departmental hearing board was scheduled to be convened on December 12, 1984 to consider the administrative charges filed against Ziegler. One week prior to the scheduled hearing, Blevins was informed by Detective Robert Delashmutt that Laughlin had admitted to Deputy State's Attorney Frank Weathersbee that she had not been truthful in her complaint that she had been raped by Canino on August 9, 1984. As a result, the State's Attorney's Office had decided to drop the rape charges against Canino.

Upon receiving this information which cast doubt on the credibility of Laughlin, Blevins reduced the administrative charges against Ziegler from "major" to "minor" violations. This reduction in charges was effected with the express approval of Blevins' superior, Lieutenant Michael P. Fitzgibbons, who was Commander of the Department's Intelligence Section. Thereafter, Ziegler was offered and accepted the maximum summary punishment available for the minor violation charged, namely a three day suspension without pay and a formal letter of reprimand.

On December 6, 1984, Ziegler was issued a letter of reprimand by Captain James Hutton, in which Hutton stated that "it is evident that you have seriously breached your duty" and that "the Department's position [is] that conduct of this nature cannot and will not be tolerated."

### III

### *Summary Judgment Principles*

■ It is well established that a defendant moving for summary judgment bears the burden of showing the absence of any genuine issue of material fact and that it is entitled to judgment as a matter of law. *Barwick v. Celotex Corp.*, 736 F.2d 946, 958 (4th Cir.1984). Where, as here, the nonmoving party will bear the ultimate burden of persuasion at trial, "the burden on the moving party (at the summary judgment stage) may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). One of the purposes of Rule 56 is to require a plaintiff, in advance of trial and after a motion for summary judgment has been filed and properly supported, to come forward with some minimal facts to show that the defendant in the case may be liable under the claims alleged. *See* Rule 56(e). If the nonmoving party "has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof," then "the plain language of Rule 56(c) mandates the entry of summary judgment." *Catrett*, 477 U.S. at 322, 323, 106 S.Ct. at 2552.

■ While the facts and all reasonable inferences drawn therefrom must be viewed in the light most favorable to the party opposing the motion, *Ross v. Communications Satellite Corp.*, 759 F.2d 355, 364 (4th Cir.

1985), "when the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Id.* "'A mere scintilla of evidence is not enough to create a fact issue; there must be evidence on which a jury might rely.'" *Barwick v. Celotex Corp.*, 736 F.2d 946, 958–59 (4th Cir.1984), (*quoting Seago v. North Carolina Theatres, Inc.*, 42 F.R.D. 627, 640 (E.D.N.C.1966), *aff'd*, 388 F.2d 987 (4th Cir. 1967)). A genuine issue of material fact cannot be created "through mere speculation or the building of one inference upon another." *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985). Moreover, only disputed issues of *material* fact, determined by reference to the applicable substantive law, will preclude the entry of summary judgment. "Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

In the absence of a minimal showing by a plaintiff that the defendant may be liable under the claims alleged, a defendant should not be required to undergo the considerable expense of preparing for and participating in a trial. *See Anderson*, 477 U.S. at 256–57, 106 S.Ct. at 2514; *Catrett*, 477 U.S. at 323–24, 106 S.Ct. at 2552–53. Indeed, the Fourth Circuit has stated that, with regard to motions for summary judgment, the district courts have "an affirmative obligation ... to prevent 'factually unsupported claims and defenses' from proceeding to trial." *Felty v. Graves–Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir.1987) (quoting *Catrett*, 477 U.S. at 323–24, 106 S.Ct. at 2553).

Applying these principles to the facts of record here, this Court has concluded that defendants' motion for summary judgment must be granted. Judgment will accordingly be entered in favor of each of the remaining defendants.

## IV

### Monell Liability

A municipality like the County in this case may not be held vicariously liable under 42 U.S.C. § 1983 for the constitutional violation of an employee merely because of the existence of that employment relationship. *Monell v. Dept. of Social Servs.*, 436 U.S. 658, 692–94, 98 S.Ct. 2018, 2036–37, 56 L.Ed.2d 611 (1978). The same principle is applicable to plaintiff's claims against the police chiefs in their official capacities.[7] The common law doctrine of *respondeat superior* has no application in actions brought under § 1983. *Spell v. McDaniel*, 824 F.2d 1380, 1385 (4th Cir.1987) (citing *Monell*), *cert. denied sub nom., Fayetteville v. Spell*, 484 U.S. 1027, 108 S.Ct. 752, 98 L.Ed.2d 765 (1988). However, municipal liability may result "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." *Monell*, 436 U.S. at 694, 98 S.Ct. at 2037–38. "Official policy" in the relatively narrow sense of discrete, consciously chosen courses of action by "policymakers" is not the only basis for imposing municipal liability. *Spell*, 824 F.2d at 1386. However, in a case such as this one, liability may be imposed on the municipality only if the "continued existence [of the custom or usage] can be laid to the fault of municipal policymakers, and a sufficient causal connection between the 'municipal custom and usage' and the specific violation can then be established." *Spell*, 824 F.2d at 1390. Such a governmental custom or usage can be said to exist only in the face of "persistent" and "widespread" practices which "[a]lthough not authorized by written law, could well be so permanent and well settled as to have the force of law." *Monell*, 436 U.S. at 691, 98 S.Ct. at 2036. The Fourth Circuit recognized in *Spell* that "the substantive requirements for establish-

---

7. The claims against the police chief defendants solely in their official capacities are under applicable law deemed to be claims against the County. *See Kentucky v. Graham*, 473 U.S. 159, 165, 105 S.Ct. 3099, 3104, 87 L.Ed.2d 114 (1985).

ing municipal liability for police misconduct are stringent indeed." *Id.* at 1391.

■ As the Fourth Circuit held in *Spell:* Municipal fault for allowing such a developed "custom or usage" to continue requires (1) actual or constructive knowledge of its existence by responsible policymakers, and (2) their failure, as a matter of specific intent or deliberate indifference, thereafter to correct or stop the practices. *Id.* at 1391.

In a case involving the alleged existence of a municipality's practice or custom of failing to punish sexual misconduct on the part of police officers, the Eighth Circuit in *Thelma D. v. Board of Education,* 934 F.2d 929, 932–33 (8th Cir.1991) held that the plaintiff was required to prove:

1) The existence of a continuing, widespread, persistent pattern of unconstitutional misconduct by the governmental entity's employees;

2) Deliberate indifference to or tacit authorization of such conduct by the governmental entity's policymaking officials after notice to the officials of that misconduct; and

3) That plaintiff was injured by acts pursuant to the governmental entity's custom, *i.e.,* that the custom was a moving force behind the constitutional violation.

Plaintiff in this case is seeking to prove municipal fault under this particular theory of § 1983 liability. Plaintiff has alleged that there existed in Anne Arundel County a "policy or custom" of "encouraging" sexual misconduct by County police officers, that the three police chiefs named as defendants had knowledge of such "policy or custom" and that this "policy or custom" is attributable to the County through the deliberate indifference of the police chiefs.

In support of their motion for summary judgment, defendants have presented three related arguments: (1) that plaintiff has failed to show the existence of a "policy or custom" on the part of the County sufficient to hold it liable for the misconduct of Ziegler; (2) that plaintiff has failed to establish that any County officials acted with the "deliberate indifference" required to establish municipal liability; and (3) that plaintiff has in any event failed to show that her injuries were proximately caused by any act or omission for which the County was legally responsible. On the record here, this Court has concluded that there is merit to all three of these arguments advanced by the defendants.

(a)

*Policy or Custom*

■ According to plaintiff, there existed in November of 1990 in the County Police Department a policy or custom of minimal discipline of male police officers against whom sexual assault charges had been filed. Plaintiff asserts that such policy encouraged defendant Ziegler to believe that he could commit rape with impunity and that Ziegler's violation of plaintiff's constitutional rights thus had the explicit or tacit approval of the County and its three chiefs of police named as defendants. On the record here, this Court has concluded as a matter of law that no such policy or custom existed.

Plaintiff's primary reliance is on the two incidents which occurred in 1979 and 1984.[8] Certainly, no weight can be given to the 1984 incident. The matter was promptly and thoroughly investigated, and major administrative charges were initially brought against Ziegler. The complainant Laughlin, who had lied to police officers in making her underlying charge of rape by Canino, admitted in a later interview that her physical contact with Ziegler had not been "sexual" in nature. The major administrative charges brought against Ziegler were accordingly reduced to minor ones. Ziegler was then disciplined not for any sexual misconduct but for failing to file a report concerning his visit to Laughlin's apartment on August 14, 1984. For such transgression, he received the maximum allowable penalty. The fact that he attempted

---

8. No contention has been made that the County's administrative handling of plaintiff's 1990 charge of rape against Ziegler constituted evidence of the claimed unconstitutional policy or custom. Nor could any such claim be made. Plaintiff's allegations against Ziegler were thoroughly investigated; he was arrested and suspended without pay; he was criminally prosecuted and convicted, and he was required to resign from the Police Department.

to suppress evidence concerning this incident and thereby avoid disciplinary action is hardly evidence that there was a sexual encounter. From the facts of record, it is apparent that the 1984 incident did not in any way constitute evidence that the County and its police chiefs had embraced a policy or custom of imposing minimal discipline on police officers charged with sexual misconduct.[9]

The 1979 incident, although it did involve a charge of rape made against Ziegler, resulted in no more than an *ad hoc* disciplinary decision made by defendant Frye pursuant to the discretionary authority vested in him as Chief of Police. This is not a case in which no discipline at all was imposed. Rather, plaintiff is claiming that the disciplinary action taken in 1979 was not severe enough. Under circumstances like those present in this case, a plaintiff must show "a failure to discipline sufficiently widespread to reflect a municipal policy." *Santiago v. Fenton*, 891 F.2d 373, 382 (1st Cir.1989). No such showing has been made by plaintiff in this case.

Evidence of record here does not support plaintiff's contention that there existed in the County a widespread and pervasive practice of minimal punishment of male police officers for sexual misconduct. The 1979 incident was not, as claimed by plaintiff, addressed "superficially" by Chief of Police Frye.[10] Rather, there was a prompt and thorough investigation made by Department personnel of Forsythe's charge that she had been raped by Ziegler. Detective Benson went to great lengths to obtain all pertinent evidence and to present it at the meeting of September 4, 1979 with the State's Attorney.

Moreover, the record here establishes that the County thoroughly investigated every complaint of sexual misconduct filed against a County police officer during the period from 1979 to 1990. Defendants have submitted the Police Department's internal investigative files relating to every complaint of sexual misconduct made against a County police officer between 1979 and 1990. These voluminous documents demonstrate that complaints of this nature were not "thrown into the waste paper basket and paid no attention ..." *See Wilson v. City of Chicago*, 6 F.3d 1233, 1239–40 (7th Cir.1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 1844, 128 L.Ed.2d 470 (1994) ("Deliberate or reckless indifference to complaints must be proved in order to establish that an abusive practice has actually been condoned by those responsible for making municipal policy."). Rather, it is apparent that complaints of sexual misconduct lodged against County police officers were vigorously investigated and that, when appropriate, disciplinary measures including termination of the accused officer's employment were imposed.

That Ziegler was not fired in 1979 under the particular circumstances of the incident in question is hardly proof of a policy or custom which was in effect in November of 1990. This Court might very well disagree with the disciplinary action taken. But evidence does not exist that Chief Frye's decision in 1979 constituted a persistent and widespread practice by County police officials which was so permanent and well settled as to have the force of County law. This is not a case like *Harris v. Pagedale*, 821 F.2d 499 (8th Cir.1987), *cert. denied*, 484 U.S. 986, 108 S.Ct. 504, 98 L.Ed.2d 502 (1987), in which there was overwhelming evidence produced at the trial indicating that City officials had repeatedly failed to investigate or respond to citizen complaints of sexual misconduct by police officers.

In claiming that there existed a County policy of failing to adequately punish sexual misconduct of its police officers, plaintiff relies on certain events which occurred after the 1979 incident had been investigated and after disciplinary action had been taken against Ziegler. When Sergeant Chaplin, at the request of Chief Frye, met with Forsythe and told her of the disciplinary action taken against Ziegler and of the decision not to prosecute him, Forsythe was "real mad."

---

**9.** Indeed, at an earlier stage of the case, this Court held that the 1984 incident had little probative value because it did not involve an allegation of rape and because Forsythe had told investigators that Ziegler's conduct was not even sexual in nature. *See* Memorandum and Order of August 24, 1994 (Slip op. at 16).

**10.** Nor was the 1984 incident "superficially" investigated.

Angry words and threats were exchanged between the two. Some 10 months later, when she learned that Ziegler had been returned to street duty, Forsythe telephoned Chief Frye and again vehemently expressed her displeasure. According to Forsythe, Chief Frye threatened to sue her if she kept calling in. These facts hardly constitute evidence of County policy which would subject it to *Monell* liability.[11]

■ In the absence of proof of any persistent and widespread pattern or practice within the County of imposing minimal discipline on male police officers charged with sexual misconduct, plaintiff must rely on the single disciplinary decision made by defendant Frye in 1979. Although conceding that a single incident cannot lead to the imposition of § 1983 liability on a municipality, plaintiff, relying on *Pembaur v. Cincinnati*, 475 U.S. 469, 480, 106 S.Ct. 1292, 1298, 89 L.Ed.2d 452 (1986), argues that the single act or omission by a policymaker can constitute a § 1983 "policy" leading to governmental liability. However, as the *Pembaur* plurality opinion also observed, a discretionary decision made even by a policymaking official does not without more give rise to municipal liability "based on an exercise of that discretion." *Id.*, at 481–82, 106 S.Ct. at 1298–99.

The *ad hoc* disciplinary decision of Chief Frye in 1979 was clearly based on an exercise of his discretion and had no general applicability. As the Fourth Circuit noted in *Spell*, 824 F.2d at 1386, "episodic exercises of discretion in the operational details of government" do not constitute actionable official policy under § 1983. As this Court observed in *Spratlin v. Montgomery County*, 772 F.Supp. 1545, 1553 (D.Md.1990), *aff'd* 941 F.2d 1207 (4th Cir.1991): "Liability of the municipality itself does not automatically attach to every decision made by a municipal officer charged with policymaking authority." *See also Cawthon v. Greenville*, 745 F.Supp. 377, 383 (N.D.Miss.1990).

Accordingly, this Court finds and concludes as a matter of law on the record here

that plaintiff has not proved the existence in the County Police Department of an unconstitutional policy or custom of encouraging or condoning sexual misconduct by County police officers.

### (b)
### Deliberate Indifference

A plaintiff, in order to impose *Monell* liability on a municipality on the basis of a claimed policy or custom, must also show that municipal officials failed to correct or stop the improper practice as a matter of specific intent or deliberate indifference. In this connection, it has been recognized that "[c]lose ex post scrutiny of municipal decisionmaking 'is an exercise ... the federal courts are ill suited to undertake.'" *Cawthon*, 745 F.Supp. at 382 (*quoting Canton v. Harris*, 489 U.S. 378, 392, 109 S.Ct. 1197, 1206, 103 L.Ed.2d 412 (1989)).

In *Wedgeworth v. Harris*, 592 F.Supp. 155, 161 (W.D.Wis.1984), the Court in granting a municipality's motion for summary judgment in a § 1983 case stated:

> The facts of the case before the Court allow no inference of conduct on the part of the City or its police supervisors which approaches [the deliberate indifference] standard. The investigation of the [first] incident appears to have been very thorough.... Only the police response to the [second] incident provides any opportunity for Monday-morning quarterbacking. Plaintiff makes the most of it. A jury might decide that [the defendant police officer] should have been confronted with the charge.... Perhaps the most damning thing that can be said about police conduct in this investigation is that [the defendant] was not pulled from the street during the period charges were pending. Yet even this decision was not reckless or grossly negligent.... The decision can be second-guessed but it cannot be termed grossly negligent or reckless.

■ This reasoning is equally applicable here. Plaintiff by the exercise of hindsight

---

**11.** Plaintiff's reliance on *Webster v. City of Houston*, 735 F.2d 838 (5th Cir.1984) (*en banc*) and other so-called police "cover-up" cases is likewise misplaced. The facts here are markedly different. There was no cover-up of the facts relating to the 1979 incident nor of the disciplinary action taken against Ziegler.

seeks to attach "increased and ominous significance" to the 1979 incident. *See Thelma D. v. Board of Educ.,* 934 F.2d 929, 933 (8th Cir.1991). A material fact of some consequence is that in 1979 the County State's Attorney declined to prosecute Ziegler. This decision was reached at a meeting which was not attended by Chief Frye. However, Detective Benson, the female investigating officer, was present at the meeting, and she argued in favor of the filing of a criminal charge of rape against Ziegler. When the consensus reached was that the evidence was insufficient to obtain a conviction, Benson eventually concurred in that decision. Duckett's decision not to prosecute was based on the absence of signs of trauma, physical beating or force and on his belief that Forsythe had had consensual sex with Ziegler. Since the State's Attorney's decision not to prosecute criminally was not the responsibility of the Chief of Police, that decision cannot form the basis for plaintiff's § 1983 claim against the County.[12]

At his deposition which was taken in March of 1995, Judge Duckett, the State's Attorney in 1979, repeatedly testified that he had no recollection whatsoever of the "entire" Ziegler matter which had been before him some fifteen and one-half years previously. He testified that even after reading reports concerning the incident including his letter of September 6, 1979, he could not remember addressing the matter of Forsythe's 1979 charge of rape against Ziegler. He had no recall whatsoever of the meeting of September 4, 1979, nor did he remember in 1995 anything which Benson or any one else may have said at that meeting.

Plaintiff places heavy reliance on Judge Duckett's response to a hypothetical question posed to him at his deposition by her attorney. Judge Duckett testified that had he been informed that Forsythe had taken and passed a polygraph examination, this fact would have weighed heavily in his

decision to prosecute, and that if he had also known that Ziegler had not cooperated, he would have decided to prosecute. Plaintiff seeks to derive from this testimony the unwarranted inference that Chief Frye and County police officers "intentionally and corruptly" misinformed State's Attorney Duckett concerning material aspects of their investigation of the Forsythe allegations. The argument is a specious one. The uncontradicted testimony of Detective Benson is that her entire investigative file was before State's Attorney Duckett at the meeting of September 4, 1979 and that all the information contained therein was reviewed by everyone then present, including the results of the polygraph test and the fact that Ziegler had asserted his right to remain silent when questioned about the incident. Indeed, Duckett's contemporaneous letter to Frye of September 6, 1979 stated that he had undertaken "a thorough review of all the facts pertaining to this incident...." These facts are not disputed in this record, particularly not by the testimony of Judge Duckett who had no independent recollection in 1995 of the 1979 meeting.

Based in part on the State's Attorney's decision that there was insufficient evidence to warrant the bringing of criminal charges against Ziegler, Chief Frye imposed the disciplinary sanctions which plaintiff now challenges. That Frye should have imposed a more severe administrative penalty, including possibly termination of Ziegler's employment by the Department, is not the ultimate issue here. What is apparent is that Frye did not act with deliberate indifference in not discharging Ziegler or in not permanently removing him from street duty.

Accordingly, this Court finds and concludes as a matter of law on the record here that plaintiff has not in this case satisfied the deliberate indifference standard for proving under § 1983 municipal fault on the part of

---

12. Liability against the County in this § 1983 action cannot be predicated upon the decision by then State's Attorney Duckett not to prosecute Ziegler. Under Maryland law, the prosecutorial discretion exercised by the state's attorney for a particular county is not a matter of county policy, since the prosecutor is a state official who

acts only pursuant to state mandates. *See* Md. Code Ann. Art. 10, § 34 *et seq.* (1994). Under such circumstances, a county cannot be held liable for even the wrongful exercise of prosecutorial discretion. *See Baez v. Hennessy,* 853 F.2d 73 (2nd Cir.1988); *Carr v. Chicago,* 669 F.Supp. 1421 (N.D.Ill.1987).

the County or on the part of the police chiefs named as defendants.

## (c)

### Causation

■ Finally, in a case of this sort a plaintiff must prove that the custom or policy relied upon proximately caused the constitutional violation. When faced with a claim of alleged municipal liability under § 1983, a court must determine whether there is a direct causal link between the municipal policy or custom and the alleged constitutional deprivation. *Canton v. Harris,* 489 U.S. 378, 391, 109 S.Ct. 1197, 1206, 103 L.Ed.2d 412 (1989); *Collins v. City of Harker Heights,* 503 U.S. 115, 123, 112 S.Ct. 1061, 1067, 117 L.Ed.2d 261 (1992). As the Fourth Circuit said in *Spell,* 824 F.2d at 1388:

> Proof merely that such a policy or custom was "likely" to cause a particular violation is not sufficient; there must be proven at least an "affirmative link" between policy or custom and violation; in tort principle terms, the causal connection must be "proximate," not merely "but-for" causation-in-fact.

Particularly instructive on the causation issue is *Martinez v. California,* 444 U.S. 277, 100 S.Ct. 553, 62 L.Ed.2d 481 (1980). In that case, a fifteen year-old girl had been murdered by one Thomas, a parolee. The young girl's survivors sued the California Parole Board under § 1983, seeking to recover substantial damages because of its allegedly erroneous decision to parole Thomas. Plaintiffs alleged that the Board had reached its decision despite knowledge that "the release of Thomas created a clear and present danger that such an incident would occur." *Id.* at 280, 100 S.Ct. at 556. In affirming the dismissal of the complaint by the trial court, the Supreme Court, in an unanimous opinion authored by Justice Stevens, stated:

> [The victim's] life was taken by the parolee five months after his release.... Further, the parole Board was not aware that [the victim], as distinguished from the public at large, faced any special danger. We need not and do not decide that a parole officer could never be deemed to "deprive" someone of life by action taken in connection with the release of a prisoner

on parole. But we do hold that at least under the particular circumstances of this parole decision, [the victim]'s death is too remote a consequence of the parole officers' action to hold them responsible under the federal civil rights law. Although a § 1983 claim has been described as "a species of tort liability," it is perfectly clear that not every injury in which a state official has played some part is actionable under the statute.

*Id.* at 285, 100 S.Ct. at 559.

Similar considerations are controlling in this case. Plaintiff argues that defendants's causation analysis focuses too narrowly on the two prior incidents of alleged misconduct by Ziegler and overlooks the fact that these incidents are merely instances of a broader policy or custom on the part of the County. According to plaintiff, "[t]he 'affirmative link,' therefore, is not between Ziegler's rape of Plaintiff and his earlier episodes of misconduct; rather, it is between the rape and the custom of indulging and protecting police misconduct that the earlier instances prove existed." But no such longstanding custom has been proved. Moreover, it is apparent that plaintiff would have this Court apply an impermissible "but-for" test of causation.

■ Evidence of record here does not indicate that there was a direct causal link between the policy or custom relied upon by plaintiff and the constitutional violation. Even if, as alleged by plaintiff, the County by its policy of minimal disciplinary action "encouraged" the unconstitutional act of Ziegler, and even if the police chiefs created "a climate in which Ziegler felt immune from the consequences" of his illegal act, such would not constitute an affirmative cause of plaintiff's injury. The sexual assault on plaintiff, which occurred more than 11 years after the 1979 incident, was too remote a consequence of County policy, even if it existed, for the Court to hold defendants legally responsible under *Monell.* The alleged shortcomings of Chief Frye's 1979 disciplinary action cannot be considered to have been the "moving force" or proximate cause of Ziegler's heinous sexual assault which occurred many years later in 1990. *Cawthon,* 745 F.Supp. at

382. As the Fourth Circuit stated in its recent decision in *Pinder v. Johnson*, 54 F.3d 1169 (4th Cir.1995): "At some point on the spectrum between action and inaction, the [County's] conduct may implicate it in the harm caused, but no such point is reached here." At 1175.

Plaintiff argues that if Ziegler had been fired in 1979, the later rape would not have occurred. According to plaintiff, keeping Ziegler on the force "was tantamount to handing him a license to rape again...." But it is not enough in an instance where a plaintiff suing under § 1983 has had her constitutional rights violated for that plaintiff "to point to something the [County] 'could have done' to prevent the unfortunate incident." *Canton*, 489 U.S. at 392, 109 S.Ct. at 1206.

For the reasons stated, this Court finds and concludes as a matter of law on the record here that plaintiff has not proved that any County policy or custom caused her constitutional injury.

## V

### *Supervisory Liability*

In Count II of her second amended complaint, plaintiff also seeks a recovery against the chief of police defendants under a theory of § 1983 "supervisory liability." It is well established that supervisory officials may be held personally liable under § 1983 in certain circumstances for a constitutional injury inflicted by their subordinates. *See Slakan v. Porter*, 737 F.2d 368 (4th Cir.1984), *cert. denied sub nom., Reed v. Slakan*, 470 U.S. 1035, 105 S.Ct. 1413, 84 L.Ed.2d 796 (1985). In *Slakan*, the Fourth Circuit reasoned that such liability is not premised upon *respondeat superior* but upon "a recognition that supervisory indifference or tacit authorization of a subordinate's misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care." *Id.* at 372–73.

■ In *Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir.1994), the Fourth Circuit described three elements necessary to establish supervisory liability under § 1983, as follows:

> We have set forth three elements necessary to establish supervisory liability under § 1983: (1) that the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed "a pervasive and unreasonable risk" of constitutional injury to citizens like the plaintiff; (2) that the supervisor's response to that knowledge was so inadequate as to show "deliberate indifference to or tacit authorization of the alleged offensive practices,"; and (3) that there was an "affirmative causal link" between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff.

To satisfy the requirements of the first element, a plaintiff must show (1) the supervisor's knowledge of (2) conduct engaged in by a subordinate (3) where the conduct poses a pervasive and unreasonable risk of constitutional injury to the plaintiff. *Slakan*, 737 F.2d at 373. A plaintiff may establish deliberate indifference by demonstrating a supervisor's "continued inaction in the face of documented widespread abuses." *Id.* In a case involving a claim of supervisory liability, the plaintiff assumes a heavy burden of proof in establishing deliberate indifference. *Shaw*, 13 F.3d at 799. Finally, causation is established only when the plaintiff demonstrates an "affirmative causal link" between the supervisor's inaction and the harm suffered by the plaintiff. *Slakan*, 737 F.2d at 376.

■ The facts of record here do not as a matter of law permit plaintiff to recover from defendants Wellham, Frye and Lindsey under a theory of supervisory liability. It has not been shown that the conduct relied upon imposed a pervasive and unreasonable risk of constitutional injury to the plaintiff. As required by *Slakan*, there is no evidence here that the conduct was "widespread" or had been used "on several different occasions." *Id.* at 373–74.

Moreover, as discussed more fully hereinabove, plaintiff has not established deliberate indifference because of continued inaction on the part of the chiefs of police in the face of documented widespread abuses. A single incident or even an isolated incident is not sufficient to permit a plaintiff to establish deliberate indifference.

Finally, for the reasons discussed herein, plaintiff has not proven causation. The concept in question encompasses both cause in fact and proximate cause. *Shaw,* 13 F.3d at 799. In this particular case, the necessary affirmative causal link has not been shown.

For these reasons, this Court finds and concludes as a matter of law that plaintiff has not proved that she is entitled to recover damages under § 1983 from defendants Wellham, Frye and Lindsey pursuant to a theory of "supervisory liability."

## VI

### *Plaintiff's Pendent State Law Claims*

There remain plaintiff's pendent state law claims of battery [13] and negligent retention. Pendent jurisdiction is a doctrine of discretion and not one of plaintiff's right. *United Mine Workers v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966). However, the Supreme Court has expressly cautioned that "[n]eedless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law. Certainly, if the federal law claims are dismissed before trial ... the state claims should be dismissed as well." *Id.* at 726, 86 S.Ct. at 1139. The principles of *Gibbs* have been codified under the name "supplemental jurisdiction." 28 U.S.C. § 1367.

Here, the only federal claims against the remaining defendants are being dismissed pursuant to defendants' motion for summary judgment. A court may decline to exercise supplemental jurisdiction if all claims over which it has original jurisdiction have been dismissed. 28 U.S.C. § 1367(c)(3). *See Shanaghan v. Cahill,* 58 F.3d 106, 109 (4th Cir.1995). A majority of the courts which have considered the question have declined to exercise pendent jurisdiction over state claims when the federal claims have been disposed of prior to a full trial on the

merits. *See Hector v. Weglein,* 558 F.Supp. 194, 204–205 (D.Md.1982). Outlining the relevant factors to be considered in determining the appropriateness of a court's exercise of its discretion to decide pendent state claims, Judge Friendly in *Kavit v. A.L. Stamm & Co.,* 491 F.2d 1176 (2d Cir.1974) said the following:

> If it appears that the federal claims ... could be disposed of on a motion for summary judgment under F.R.Civ.P. 56, the court should refrain from exercising pendent jurisdiction absent exceptional circumstances.

*Id.* at 1180.

Since summary judgment has been granted as to plaintiff's federal claims against these remaining defendants and since there are no exceptional circumstances here, this Court will not exercise pendent jurisdiction in this case over plaintiff's remaining claims of battery and negligent retention. Accordingly, defendants' motion for summary judgment will be granted in its entirety.

## VII

### *Count V of Plaintiff's Second Amended Complaint*

In Count V of her second amended complaint, plaintiff asks the Court to direct the County to fully indemnify each individual defendant against whom a judgment for compensatory and punitive damages had been entered. In moving to dismiss Count V, the County asserts that this Court lacks jurisdiction at this stage of these proceedings to consider plaintiff's claim of indemnification.

Quite obviously, plaintiff is not entitled to seek indemnification from the County based on her claims against defendants Wellham, Frye and Lindsey. As a result of the Court's rulings herein, final judgment will be entered in favor of each of these three defendants. The question remains whether plaintiff is entitled at this stage of these proceed-

---

**13.** It is not entirely clear that plaintiff has in fact alleged a claim of battery against the County. In Count III, it is stated that plaintiff "sues Michael Dennis Ziegler, individually, ..." (¶ 108). However, in the "WHEREFORE" clause of Count III, it is stated that plaintiff "demands judgment against the defendants, Michael Dennis Ziegler and Anne Arundel County, jointly and severally...." The Court will accordingly assume that a claim of battery has been asserted against the County in this case.

ings to seek indemnity from the County because of the judgment awarded in her favor against defendant Ziegler in the aggregate amount of $1,050,000. On the record here, this Court has concluded that this claim of indemnification is premature. The County's motion to dismiss Count V of the second amended complaint will therefore be granted.

It is apparent that plaintiff is here seeking to enforce as a part of this suit a judgment which has not as yet been entered. Plaintiff is therefore prematurely asking this Court to grant relief under Rule 69(a), F.R.Civ.P., which provides as follows:

**Rule 69. Execution**

**(a) In General.** Process to enforce a judgment for the payment of money shall be a writ of execution, unless the court directs otherwise. The procedure on execution, in proceedings supplementary to and in aid of a judgment, and in proceedings on and in aid of execution shall be in accordance with the practice and procedure of the state in which the district court is held, existing at the time the remedy is sought, except that any statute of the United States governs to the extent that it is applicable. In aid of the judgment or execution, the judgment creditor or a successor in interest when that interest appears of record, may obtain discovery from any person, including the judgment debtor, in the manner provided in these rules or in the manner provided by the practice of the state in which the district court is held.

Once final judgment has been entered in this case against defendant Ziegler, plaintiff would be entitled to resort to supplementary proceedings to enforce that judgment. Whether or not this Court would then have supplemental jurisdiction to consider plaintiff's claim of indemnity against the County is an issue which need not be addressed until it appears that the final judgment entered against Ziegler has not been satisfied and until plaintiff has then filed an appropriate motion under Rule 69(a).

Cases relied upon by plaintiff are not to the contrary. *Argento v. Village of Melrose Park,* 838 F.2d 1483 (7th Cir.1988) involved a post-judgment motion seeking to collect judgments, filed pursuant to Rule 69(a). In

*Skevofilax v. Quigley,* 810 F.2d 378 (3d Cir.) (*en banc*), *cert. denied, sub nom. Edison v. Skevofilax,* 481 U.S. 1029, 107 S.Ct. 1956, 95 L.Ed.2d 528 (1987), the Third Circuit held that the district court had ancillary jurisdiction to adjudicate a post-judgment garnishment action brought by a judgment creditor against a nonparty to the original law suit. *See also Berry v. McLemore,* 795 F.2d 452 (5th Cir.1986). In each of these cases, the plaintiff had sought relief from the municipality only after the plaintiff had obtained and had been unable to collect on a final judgment entered against the individual officer who had violated the plaintiff's constitutional rights. Without "a judgment against some one entitled to indemnification, there is nothing for the [County] to indemnify." *Bell v. Milwaukee,* 536 F.Supp. 462, 476 (E.D.Wisc.1982), *aff'd in relevant part,* 746 F.2d 1205, 1268–72 (7th Cir.1984).

In this case, a final judgment has not as yet been entered against defendant Ziegler. The County's motion to dismiss Count V will therefore be granted, without prejudice to the right of plaintiff to first seek satisfaction from defendant Ziegler on the judgment entered against him and, if unable to satisfy that judgment, to then file an appropriate motion under Rule 69(a).

## VIII

### *Plaintiff's Motion to Compel*

Also pending in this case is a motion filed by plaintiff to compel the production of documents. By way of that motion, plaintiff seeks to compel the production by the County of a broad range of documents. The motion, together with supporting and opposing memoranda, was submitted to the Court pursuant to Local Rule 104.8 several months before defendants filed their motion for summary judgment. As a result of the Court's rulings herein, plaintiff's motion to compel is now moot and will be denied.

At a conference with counsel held several months ago, the Court inquired whether plaintiff was requesting the Court to rule on plaintiff's motion to compel before plaintiff filed its opposition to defendants' motion for summary judgment. Counsel for plaintiff

advised the Court on that occasion and later during oral argument that, in opposing defendants' motion for summary judgment, plaintiff did not intend to rely on any evidence which might be secured by way of its pending motion to compel. According to plaintiff's counsel, the evidence sought by plaintiff in her motion to compel was desired solely for use at the trial of her claims against the County and the police chiefs. Since there will be no such trial, plaintiff's motion to compel is now moot and will be denied without prejudice.[14]

## IX

### *Conclusion*

For all the reasons stated, defendants' motion for summary judgment will be granted, and final judgment will be entered in favor of the County and defendants Wellham, Frye and Lindsey. The County's motion to dismiss Count V of plaintiff's second amended complaint will be granted, and plaintiff's motion to compel production of documents will be denied as moot. An appropriate Order will be entered by the Court.

**14.** Plaintiff's right to the discovery of documents relating to her claim of indemnity is premature because no motion under Rule 69(a) has as yet been filed by plaintiff.